**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**RICHARD BOONE, II,**

**Plaintiff,** **CIVIL ACTION NO. 12-cv-14098**

**v.** **DISTRICT JUDGE ARTHUR J. TARNOW**

**DANIEL HEYNS *et al*.,** **MAGISTRATE JUDGE MONA K. MAJZOUB**

**Defendants.**
**______________________________/**

## REPORT AND RECOMMENDATION

Plaintiff Richard Boone, II, proceeding *pro se*, initiated this prisoner civil rights action pursuant to 42 U.S.C. § 1983 on September 9, 2012, against employees of the Michigan Department of Corrections (MDOC) and Corizon Health, Inc. (Corizon), claiming that his medical care in prison amounted to cruel and unusual punishment in violation of his Eighth and Fourteenth Amendment rights. (Docket no. 1.) At this juncture, Plaintiff's case is proceeding on his Fourth Amended Complaint filed on May 21, 2018, by his most recently appointed counsel. (Docket no. 305.)

This matter comes before the court on two motions. The first is a Motion for Summary Judgment filed by the remaining MDOC Defendants, former Chief Medical Officer (CMO) Jeffrey Stieve, M.D. and Registered Nurse (RN) Brenda Upston. (Docket no. 342.) The parties subsequently stipulated to the dismissal of Defendant Upston, Plaintiff filed a Response to the Motion, and Defendant Stieve replied to Plaintiff's Response. (Docket nos. 358, 366, 367.) The second Motion is a Motion for Summary Judgment filed by Defendants Corizon, Richard Miles, M.D., Harriet Squier, M.D., Margarette Ouellette, P.A., and Mark Boomershine, P.A. (hereinafter

referred to as "the Corizon Defendants"). (Docket no. 345.) Plaintiff responded to the Corizon Defendants' Motion, the Corizon Defendants replied to Plaintiff's Response, and Plaintiff filed a Sur-Reply, with leave of court. (Docket nos. 371, 381, 385.) This action was referred to the undersigned for all pretrial purposes on February 8, 2019. (Docket no. 351.) The undersigned has reviewed the pleadings, dispenses with oral argument on the Motions pursuant to Eastern District of Michigan Local Rule 7.1(f), and issues this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I. RECOMMENDATION

For the reasons that follow, it is recommended that Defendant Lybarger be dismissed from this action pursuant to Federal Rule of Civil Procedure 25, the MDOC Defendants' Motion for Summary Judgment (docket no. 342) be **GRANTED** with regard to Plaintiff's claims against Defendant Stieve and **DENIED** as moot with regard to Plaintiff's claims against Defendant Upston, the Corizon Defendants' Motion for Summary Judgment (docket no. 345) be **GRANTED**, and this matter be dismissed in its entirety.

## II. REPORT

### A. Background

Plaintiff was initially incarcerated within the custody of the MDOC in May 2003 and released on parole in 2008. On October 21, 2009, Plaintiff attempted to rob a store and while fleeing the scene of the crime, he fell in a ditch and fractured his left tibial plateau, among other things. Plaintiff was arrested and treated for his injuries at Botsford Hospital and then confined in the Wayne County Jail until March 16, 2011, when he was returned to the custody of the MDOC. The events giving rise to the Fourth Amended Complaint allegedly occurred between March 2011 and September 2012, while he was incarcerated at the Charles Egeler Reception and Guidance

Center (RGC) and the G. Robert Cotton Correctional Facility (JCF), both of which are located in Jackson, Michigan.[1] Generally, Plaintiff alleges that Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment by denying him adequate medical care for sleep apnea, kidney stones, right foot drop, residual left knee problems following surgery on his left tibia, and the complications and residual effects of a total right hip replacement. (Docket no. 305.)

*1. Sleep Apnea*

Plaintiff experienced episodes of obstructive sleep apnea while being treated at Botsford Hospital in October 2009. (Docket no. 305 ¶ 24; docket no. 375 at 1.) He received a continuous positive airway pressure (CPAP) machine from his mother to use for the sleep apnea while at the hospital, and he was discharged to the Wayne County Jail with instructions to continue using the CPAP machine at night. (Docket no. 305 ¶ 24; docket no. 375 at 2, 4.) Medical staff at the Wayne County Jail allowed Plaintiff to continue using the CPAP machine. (Docket no. 305 ¶ 25.)

Plaintiff was transferred to RGC on March 16, 2011, with his CPAP machine, but it was taken from him upon intake to be x-rayed and evaluated for medical necessity. (Docket no. 305 ¶¶ 30-31; docket no. 375 at 7.) Defendant Boomershine initially ordered a special accommodation for Plaintiff's CPAP machine, but after Plaintiff told the Respiratory Staff that he had not had a sleep study, it was withheld from Plaintiff pending review of Plaintiff's documentation therefor. (Docket no. 305 ¶¶ 32-34; docket no. 375 at 7.) Plaintiff provided the MDOC with his 2009 records from Botsford Hospital, but Defendant Boomershine told Respiratory Staff to continue withholding the CPAP machine until he followed up with Plaintiff. (Docket no. 305 ¶¶ 34-35; docket no. 375 at 8.) A subsequent kite response indicated that the CPAP machine was being

[1] Plaintiff was paroled in 2018.

withheld for lack of a sleep study and proper documentation. (Docket no. 305 ¶¶ 38-39; docket no. 375 at 9.) Defendant Boomershine reviewed Plaintiff's chart on April 12, 2011, and noted that Plaintiff had no sleep study on file and had been using a CPAP machine that apparently had not been prescribed for him. (Docket 375 at 14.) Defendant Boomershine opined that the use of a CPAP now may be problematic and not in Plaintiff's best interest. (*Id.*) The CPAP machine was not returned to Plaintiff.

Plaintiff was transferred to JCF on April 27, 2011. (Docket no. 305 ¶ 41.) He sent a medical kite regarding sleep apnea, an inability to sleep, tiredness, and irritability on June 8, 2011. He was seen in response to this kite on June 9, 2011, and the medical provider sent an email to the nursing supervisor and Housing Unit Manager (HUM) to address the issue of Plaintiff's CPAP machine. (Docket no. 305 ¶¶ 49; docket no. 375 at 15-16.) On August 8, 2011, Plaintiff had an appointment with Defendant Miles, and he told Defendant Miles that he had not received the CPAP machine because there is no sleep study on file. (Docket no. 375 at 18). Plaintiff had another appointment with Defendant Miles on September 26, 2011, at which Defendant Miles noted that Plaintiff had previously used the CPAP machine with good response, that he was awakening with shortness of breath and had difficulty staying asleep. (*Id*. at 21-23.) Defendant Miles gave Plaintiff an Epworth Sleepiness Scale ("ESS") test;[2] and Plaintiff scored a 12. (*Id.*) Defendant Miles assessed Plaintiff's sleep apnea as good and ordered a sleep study for October 10, 2011. (*Id.*) Plaintiff had another visit with Defendant Miles on October 21, 2011, who noted that Plaintiff's sleep apnea was a *chronic problem*, but there was no notation regarding scheduling a sleep study. (*Id*. at 24-25.) Defendant Miles conducted a chart review on October 25, 2011, noted that there was no documented indication or prescription for a CPAP machine, and he terminated Plaintiff's

[2] Plaintiff explains that the ESS was developed in 1990 to assess daytime sleepiness, and a "normal" ESS score ranges from 0-10. (Docket no. 371 at 8 n.4 (citing https://epworthsleepinessscale.com/about-the-ess/).)

SA therefore.  (*Id*. at 26-27.)  Defendant Miles requested a Respiratory Therapy Evaluation for Sleep Apnea on October 28, 2011.  (*Id*. at 28-291-23.)  Defendant Squier denied Defendant Miles's request on November 3, 2011, citing no evidence of hypertension and recommended that Plaintiff initiate weight loss, decrease his upper body development, increase his aerobic activity, and continue to be monitored.  (*Id*. at 30-31.)

At a January 6, 2012 and April 23, 2012 medical appointments, Plaintiff reported difficulty initiating/maintaining sleep, and gasping during sleep, and his ESS score increased to 18. Defendant Lybarger assessed Plaintiff's sleep apnea as fair but noted that Plaintiff did not meet the criteria for a sleep study.  On April 23, 2012, Defendant Lybarger ordered a CPAP machine for Plaintiff.  Plaintiff requested a sleep study on May 16, 2012. At a June 12, 2012 appointment, Defendant Ouellette noted that Plaintiff used a CPAP machine without a sleep study prior to incarceration and that a consult for a sleep study was not approved in 2011.  On July 24, 2012, Plaintiff kited that he awakes gasping for air.  On July 27, 2012, Dr. Michael Szymanski indicated that he would request use of a CPAP machine or formal testing for sleep apnea if the CPAP was deferred, and he made that request on July 31, 2012.  Defendant Stieve deferred Dr. Szymanski's request with instructions to confirm that Plaintiff's CPAP machine was still in storage, get external records but if not available consider sleep study, and encourage weight loss.  (Docket no. 375 at 39-61.)

Plaintiff initiated this lawsuit on September 9, 2012.  In Count 1 of the Fourth Amended Complaint, Plaintiff claims that Defendants Miles, Lybarger, Ouellette, Boomershine, Stieve, and Squier knowingly, intentionally, and deliberately deprived Plaintiff use of his CPAP machine by refusing to follow Botsford Hospital's discharge instructions and refusing to listen to Plaintiff's complaints about his need for a CPAP to relieve pain and get some sleep.  Plaintiff claims that

Defendants' denial of the CPAP machine has caused him "unnecessary and wanton infliction" of physical, mental, and emotional pain and suffering, and deprived him of oxygen and sleep, in violation of the Eighth Amendment. (Docket no. 305 ¶¶ 198-99.)

On October 11, 2012, Defendant Squier approved Plaintiff for a sleep study, which was performed on November 14, 2012. The sleep study report, dictated on January 15, 2013, indicated diagnoses of obstructive sleep apnea, significant nocturnal hypoxemia, and possible associated central apnea, and it recommended clinical correlation and implementation of an auto set CPAP machine. The CPAP machine was approved on February 4, 2013, and on February 6, 2013, a Special Accommodation for the CPAP was issued with no stop date and the CPAP was provided to Plaintiff. (Docket no. 375 at 76-79, 85-87, 92-94.)

*2. Kidney Stones*

Plaintiff presented to MDOC healthcare in the early morning hours of August 2, 2011, with abdominal pain and an inability to urinate. Defendant Miles examined Plaintiff and ordered that he be taken to Allegiance Hospital. An abdominal CT scan revealed a five-millimeter kidney stone and a four-millimeter kidney stone. Plaintiff was discharged from the hospital with prescriptions for Flomax and Vicodin and was told to "[a]rrange for a follow up appointment . . . in 3-5 days or immediately if symptoms get worse." Plaintiff was discharged to the MDOC's Duane L. Waters Health Center, where orders for the Flomax and Vicodin were given. Upon Plaintiff's return to JCF, a nurse noted that Plaintiff would see a medical service provider on August 3, 2011 for a follow up and a possible order of medication. An August 3, 2011 Clinical Progress Note generated at 8:40 a.m. indicates that a hand-written prescription for Vicodin was received, Vicodin requires an approval from a Regional Medical Officer, and a copy of the prescription and a chart review

request were forwarded to Defendant Miles for review. (Docket no. 305 ¶¶ 60-63; docket no. 379 at 1-9.)

Plaintiff sent a kite on August 3, 2011 at 11:32 p.m., inquiring about his follow up appointment and the pain medication that still not been administered. The kite response states, "RMO needed for Vicodin. There has been a note forwarded to the MSP regarding this." An August 5, 2011 Administrative Progress Note indicates that the request for RMO approval for Vicodin was still pending. Plaintiff had an appointment with Defendant Miles on August 8, 2011, at which Defendant Miles noted that Plaintiff was still in intense pain, the stones had still not passed, and Plaintiff had not received his Vicodin. Defendant Miles ordered Pyridium[3] for Plaintiff, ordered that Plaintiff have continuous access to a toilet from August 8, 2011 to August 22, 2011, and requested approval of the Vicodin prescription. The Vicodin was approved on August 9, 2011. On August 12, 2011, Boone still had not received the Vicodin and sent a kite. The Vicodin was administered to Plaintiff on August 12, 2011 through August 19, 2011 – ten days after Allegiance Hospital prescribed it and three days after MDOC approval. (Docket no. 379 at 4, 10-17.)

Plaintiff was still complaining of kidney stone pain at an appointment with Defendant Miles on August 24, 2011, so Defendant ordered Pyridium for Plaintiff through August 29, 2011, and Naproxen through October 24, 2011. Over the next few weeks, Plaintiff sent kites requesting extension of his medical detail for continual access to the toilet. Medical records indicate that the medical detail was extended from August 23, 2011 through September 6, 2011, and then again through September 13, 2011. On September 12, 2011, Defendant Miles extended Plaintiff's toilet detail through October 3, 2011, and requested a urology evaluation. (1424-27). Defendant Squier

[3] Plaintiff explains that Pyridium is a drug prescribed to numb or ease pain associated with urination while attempting to pass a kidney stone. (Docket no. 371 at 20 n.20 (citation omitted).)

denied the request for a urology evaluation on September 26, 2011, in favor of an alternative treatment plan to repeat a urinalysis, and if blood was present, to consider an imaging study. Defendant Squier reasoned that four-millimeter stones usually passed on their own. A urinalysis was conducted on October 4, 2011, which was negative for blood. Plaintiff continued to complain of kidney stone pain and intermittent episodes of urinary frequency at October 21, 2011 and November 10, 2011 appointments with Defendant Miles, and Defendant Miles ordered another urinalysis. On November 22, 2011, Plaintiff was still experiencing decreased urine and lower abdominal pain, and the treating medical provider sent a request for Flomax, which was deferred in favor of a formulary alpha blocker. Defendant Lybarger prescribed the alpha blocker, Cardura, on December 5, 2011. (Docket no. 346 at 30, 59-61; docket no. 379 at 19-38.)

Plaintiff continued to complain of left flank pain from his from kidney stones at a chronic care appointment on January 6, 2012, but he was negative for cloudy urine, decreased stream, decreased urine output, dysuria, foul urine odor, frequent urination, groin mass, nocturia, and urinary hesitancy. He did not have any genitourinary complaints at his February 1, 2012 appointment with Defendant Miles. An October 11, 2012 urinalysis revealed a trace amount of blood. Plaintiff asserts that his kidney stones finally passed in May or June 2013 – two years after their onset. (Docket no. 346 at 70-71; docket no. 379 at 40-49.)

In Count Two of the Fourth Amended Complaint, Plaintiff claims that Defendants Miles, Lybarger, and Squier knowingly, intentionally, and deliberately denied him “timely access to his medication and an [sic] urologist in compliance with his medical instructions,” which left him in unnecessary pain, in violation of the Eighth Amendment. (Docket no. 305 ¶¶ 202-03.)

*3. Ankle Foot Orthosis (AFO) Brace*

Plaintiff asserts that he was severely injured in a car accident at age fourteen, which resulted in right foot drop or right foot palsy. He asserts that he cannot move four toes or his right foot as a result and that he was prescribed an AFO brace to aid his walking. (Docket no. 371 at 22 (citing docket no. 380 at 1-3).) In an affidavit submitted with his Response to the Corizon Defendants' Motion for Summary Judgment, Plaintiff attests that he told the MDOC medical staff about his right foot drop during his initial incarceration and was subsequently issued two soft AFO braces. (Docket no. 371-2 ¶¶ 1-5.) When those braces wore out, the MDOC provided him with a third AFO brace. (*Id*. ¶ 6.) He continued to use the third AFO brace while on parole in 2008 and later received an order in the Wayne County Jail for the continued use of the AFO brace. (*Id*. ¶¶ 7-8.)

Plaintiff returned to MDOC custody on March 16, 2011, wearing the third soft AFO brace, which he attests was in a state of complete disrepair. (Docket no. 371-2 ¶ 9.) On March 17, 2011, Plaintiff met with Defendant Boomershine, who issued Plaintiff a Special Accommodation for "Brace, AFO, 24 Hours." The brace was given to Plaintiff the same day. (Docket no. 380 at 4-7.) When Plaintiff was transferred from RGC to JCF on April 27, 2011, a medical detail was generated at screening, which included the AFO brace. The medical detail was valid from April 27, 2011 until May 27, 2011. (*Id*. at 8-9.). On May 18, 2011, June 8, 2011, and June 11, 2011, and June 13, 2011, Plaintiff sent kites requesting an AFO brace replacement, but the replies indicated that he could ask about replacement during his next visit, for which no date was given. (*Id*. at 10-13.)

Plaintiff had an appointment with Defendant Miles on June 17, 2011, and requested a new AFO brace. Defendant Miles noted decreased muscle strength in Plaintiff's right foot. On July 1, 2011, Plaintiff sent a kite asking for a referral to physical therapy for a new AFO brace. The kite response indicated that a chart review was needed and that a reminder was sent to the medical

service provider. Plaintiff sent another kite requesting a new AFO brace on August 3, 2011. Plaintiff asserts that he continued to ask Defendant Miles for a new AFO brace at appointments on August 8, 2011, August 24, 2011, September 12, 2011, September 26, 2011, and October 21, 2011, but that Defendant Miles never documented his requests. Plaintiff again kited for an AFO brace on November 14, 2011, and the response indicated that a note was sent to the medical provider. In a November 22, 2011 Administrative Progress Note, Defendant Lybarger indicated that she discussed the issue with Defendant Miles, who said that he would follow up with Plaintiff. Plaintiff asserts that Defendant Miles again failed to note anything about Plaintiff's requests for a new AFO brace in his February 1, 2012 and March 13, 2012 treatment notes. An April 23, 2012 treatment note indicates that an AFO brace was ordered for Plaintiff. On July 27, 2012, Dr. Szymanski noted Plaintiff's history of right foot drop and his request to replace his AFO brace. Dr. Szymanski indicated that he would seek RMO approval of a new AFO brace. (Docket no. 371 at 23; docket no. 380 at 14-39.) Plaintiff received a new AFO brace on August 20, 2012. (Docket no. 305 ¶ 181.)

In Count Three of the Fourth Amended Complaint, Plaintiff claims that Defendants Miles and Ouellette knowingly, intentionally, and deliberately refused to order Plaintiff a new AFO brace to help with Plaintiff's foot drop and interfered with Plaintiff's use of his AFO brace. He claims that Defendants' refusal to allow Plaintiff to use his AFO brace left Plaintiff at a potential risk of serious harm, in violation of the Eighth Amendment. (Docket no. 305 ¶¶ 206-07.)

*4. Left Knee Brace*

Plaintiff was prescribed with a stabilizing knee brace on March 14, 2011. Plaintiff asserts that he was transferred from the Wayne County Jail to the MDOC on March 16, 2011, before he could obtain the brace; however, the RGC intake records indicates that Plaintiff arrived at RGC

with a knee brace.  From April to August 2011, Boone requested replacements of his knee brace due to continued pain.  According to Plaintiff, Defendant Miles took no action regarding Plaintiff's left knee brace at their first appointment on August 8, 2011 or at subsequent appointments in August and September 2011.  (Docket no. 371 at 17; docket no. 378 at 1-15.)

Defendant Miles acknowledged Plaintiff's complaints of knee pain and his prescription for a knee brace at an October 21, 2011 appointment, and prescribed Celebrex for Plaintiff's pain.  On November 2, 2011, Defendant Miles indicated that Plaintiff's knee brace was in need of repair and submitted a repair request.  Dr. William Borgerding deferred the request because he could not find a special accommodation for the knee brace.  Physician Assistant (PA) Aryan Taymour pointed out that Plaintiff did indeed have a special accommodation for a knee brace and sent another request on November 22, 2011.  Defendant Lybarger also submitted  a request for a knee brace for Plaintiff on December 5, 2011.  On December 6, 2011, Dr. Borgerding again deferred the request, stating "[n]eed evidence of ligamentous instability on exam, not pain or crepitance[.]"  (Docket no. 378 at 19-21, 23-30.)

On January 6, 2012, Defendant Lybarger noted left knee tenderness and mildly reduced range of motion upon examination.  She instructed Plaintiff to continue his medication.  Plaintiff continued to complain of knee pain in February, March, May, and June 2012.  At a June 12, 2012 appointment with Defendant Ouellette, Plaintiff reported constant severe left knee pain, which included aching, burning, pinching, swelling; all aggravated by walking and standing.   On examination, Defendant Ouellette noted that Plaintiff had a left-sided limp, that he ambulated with a cane, minimal swelling and mild crepitus in Plaintiff's left knee but that it was non-tender to palpation, and that Plaintiff was able to cross his left leg.  Defendant Ouellette ordered an ice detail and instructed Plaintiff to continue his current medication and follow an exercise program.

Defendant Ouellette ordered x-rays of Plaintiff's left knee on July 2, 2012. On July 25, 2012, Plaintiff complained of continued issues involving his knee. On July 27, 2012, Dr. Szymanski examined Plaintiff and noted crepitation and deceased left knee strength and mobility. Plaintiff complained of continued knee pain on August 26, 2012 and August 28, 2012. (Docket no. 378 at 30-52.)

Plaintiff's left knee hardware was removed on March 21, 2013. (Docket no. 378 at 58-59.) Plaintiff attests that he stopped using the knee brace after the surgery but that he eventually obtained another knee brace in June 2013. (Docket no. 371-2 ¶¶ 17-18.) The MDOC discontinued the knee brace in December 2013 due to a lack of objective findings of weakness and instability, but it was returned to Plaintiff pursuant to a December 19, 2013 court order. (Docket no. 81; docket no. 378 at 60.) Plaintiff attests that he continued to use that stabilizing knee brace until he received another one from MDOC shortly before his release on March 14, 2018. (Docket no. 371-2 ¶ 20). After his release, Plaintiff received a total left knee replacement on June 7, 2018. (*Id.* ¶ 21.)

In Count Four of the Fourth Amended Complaint, Plaintiff claims that Defendants Miles, Lybarger, and Ouellette knowingly, intentionally, and deliberately denied Plaintiff use of his left knee brace, refusing to follow Plaintiff's discharge instructions from the hospital and refusing to listen to Plaintiff's complaints about his knee pain. Plaintiff claims that Defendants' denial of the knee brace left him at a potential risk of severe harm, in violation of the Eighth Amendment. (Docket no. 305 ¶¶ 210-11.)

*5. Left Knee Hardware*

Plaintiff fractured his left tibia on October 21, 2009, and subsequently underwent surgery at Botsford Hospital to repair the fracture, which included the placement of metal hardware around

his knee.  (Docket no. 377 at 9-10.).  On March 14, 2011, a surgeon scheduled the removal of the hardware for some time within the next month, at Plaintiff's request.  (*Id*. at 1-4.)

Before the surgery could be performed, Boone was transferred from the Wayne County Jail to the custody of the MDOC, on March 16, 2011.  Plaintiff informed the MDOC of his knee pain and alleged need for surgery upon intake at RGC.  Defendant Boomershine examined Plaintiff on March 17, 2011, and noted "[s]light bossing L medial knee fixation device."  From March 2011 through August 2011, Plaintiff continued to inform MDOC staff (including Defendant Miles) of his knee pain and the alleged need for removal of the hardware.  On August 8, 2011, Defendant Miles ordered an x-ray exam on Plaintiff's knee.  The next time Plaintiff complained of knee pain to Defendant Miles was on October 21, 2011.  Defendant Miles noted Plaintiff's pain complaints and Plaintiff's assertion that he was told that the hardware needed to be removed from his knee, and Defendant Miles prescribed Celebrex for Plaintiff's pain.  On November 10, 2011, Defendant Miles requested an orthopedic evaluation for the removal of Plaintiff's left knee hardware.  Defendant Lybarger resubmitted that request on December 5, 2011, due to no response.  Defendant Squier denied the request on December 9, 2011, reasoning that there was no medical necessity for the procedure at that time.  She relied on the normal results from Plaintiff's December 5, 2011 physical examination and further reasoned that "[m]edications and surgery are far less effective for symptom relief than weight loss."  (Docket no. 377 at 11-28, 31-48.)

On February 2, 2012, Defendant Miles met with Plaintiff, noted Plaintiff's disagreement with the findings regarding his left knee, and discussed Defendant Squier's denial of the orthopedic request and the alternative treatment plan set forth.  From February to June 2012, Plaintiff continued to send kites and requests for medical care with regard to his knee pain and left knee hardware.  At a June 12, 2012 appointment with Defendant Ouellette, Plaintiff reported constant

severe left knee pain, which included aching, burning, pinching, swelling; all aggravated by walking and standing. On examination, Defendant Ouellette noted that Plaintiff had a left-sided limp, that he ambulated with a cane, minimal swelling and mild crepitus in Plaintiff's left knee but that it was non-tender to palpation, and that Plaintiff was able to cross his left leg. Defendant Ouellette ordered an ice detail and instructed Plaintiff to continue his current medication and follow an exercise program. Defendant Ouellette ordered x-rays of Plaintiff's left knee on July 2, 2012. The x-ray revealed calcification of the articulating cartilage at the knee suggestive of CPPD[4] and demineralization of the bony architecture representing osteoporosis/osteopenia. (1607). On July 31, 2012, Dr. Szymanski submitted a request for the removal of the Plaintiff's left knee hardware. Defendant Squier denied this request on August 2, 2012, again finding that medical necessity was not demonstrated. She reasoned that the most common reasons for hardware removal – infection and failure – were not present on the x-rays and that hardware removal was no guarantee of pain relief and generally not medically necessary. Her alternative plan was to perform further testing, which was performed and returned normal results. (Docket no. 346 at 91; docket no. 377 at 54-85.) Plaintiff initiated this lawsuit on September 9, 2012.

At a September 16, 2012 chronic care visit, Dr. Bhamini Sudhir indicated that he would start treating Plaintiff's knee for CPPD and evaluate his response to the treatment. On September 24, 2012, a clinical progress note was made to Plaintiff informing him that the colchicine for his CPPD was being held because of the potential for a drug interaction with an antibiotic Plaintiff was on for a different complaint. On October 9, 2012, Dr. Sudhir requested and Defendant Squier authorized an orthopedic consultation. On the same day, Dr. Sudhir also authorized an extra pillow for Plaintiff's knees. On November 21, 2012, left knee X-rays were taken with an impression of

[4] Defendant explains that Calcium Pyrophosphate Deposition Disease (CPPD) is a type of arthritis similar to gout and often treated with NSAIDs and/or colchicine. (Docket no. 345 at 20 n.3 (citing www.verywellhealth.com).)

surgical intervention with old healed trauma, arthritic changes seen on the posterior surface of the patella as well as at the knee joint articulating surface, and no acute osseous changes. Plaintiff was also seen by orthopedic surgeon Dr. Khawaja Ikram who recommended physical therapy for strengthening followed by surgical removal of the hardware. (Docket no. 346 at 94-95, 102; docket no. 347 at 2-4, 17-18.)

On December 4, 2012, Dr. Rickey Coleman authorized one physical therapy visit at Duane Waters Hospital for evaluation and exercise program recommendations. Defendant Squier approved six additional outpatient physical therapy visits on December 19, 2012, at the request of the physical therapy department. Plaintiff refused to attend the next three physical therapy sessions. On February 7, 2013, Plaintiff attended a physical therapy session where it is noted that he tolerated the session well with improving range of motion but still complained of pain at the site of the hardware. On February 19, 2013, Plaintiff attended a physical therapy session which was limited due to pain at hardware site. On February 21, 2013, Plaintiff attended a physical therapy session where he inquired if it was his last day, stating "it doesn't matter I just want them to do the surgery anyway." Plaintiff refused to attend his last physical therapy session on February 26, 2013. (Docket no. 347 at 15-16, 22-23, 30-32, 36, 37, 39, 42.)

On March 5, 2013, Dr. Squier approved the surgical removal of the left knee hardware. (Docket no. 347 at 40-41.) Plaintiff's left knee hardware was removed March 21, 2013. (Docket no. 378 at 58-59.)

In Count Five of the Fourth Amended Complaint, Plaintiff claims that Defendants Corizon, Miles, Lybarger, Ouellette, Boomershine, and Squier knowingly, intentionally, and deliberately denied Plaintiff surgery to get the hardware from his knee removed for two years, failed to listen to his complaints about extreme pain and failed to follow the discharge instructions from the

hospital that he needed to get the hardware removed within a year. Plaintiff claims that Defendants' actions in this regard left him in "unnecessary and wanton infliction" of physical, mental, and emotional pain and suffering, in violation of the 8th Amendment. (Docket no. 305 ¶¶ 214-15.)

*6. Air Mattress*

In March 2008, Plaintiff underwent a total right hip replacement at the University of Michigan and was discharged back into MDOC custody with orders to sleep on an air mattress. (Docket no. 305 ¶¶ 19-20.) He subsequently received a special accommodation for an air mattress and continued to use it until he was paroled in 2008. (*Id.* ¶¶ 21-22.) Upon his return to the MDOC on March 17, 2011, Defendant Boomershine issued a special accommodation to Plaintiff for an air mattress. When Plaintiff was transferred to JCF, an air mattress was ordered for him on April 27, 2011 with a stop date of May 27, 2011. On May 23, 2011, Plaintiff submitted a kite requesting a new air mattress because his current one was leaking and was informed that he would be called out to exchange his old mattress for a new one. The exchange happened on May 25, 2011. Plaintiff exchanged his air mattress again on November 29, 2011. (Docket no. 346 at 2, 12, 14-15, 58.)

Plaintiff requested a new air mattress on March 5, 2012, and Licensed Practical Nurse Karina Beals told Plaintiff that it was being discontinued because according to Defendant Stieve and the standard criteria, Plaintiff did not meet the qualifications for an air mattress. On March 13, 2012, Defendant Miles informed Plaintiff that he did not meet the criteria for an air mattress. Plaintiff asserts that he began to experience severe back and hip pain after his air mattress was discontinued and sent multiple kites regarding the pain that he was experiencing. He was given an extra pillow for his hip on October 9, 2012. Plaintiff treated with Dr. Shanthi Gopal on November 1, 2012, at which appointment he was upset about his air mattress not being restored.

Dr. Gopal advised Plaintiff to try the stretching exercises and weight loss recommended by the RMO; he also requested RMO approval for the non-formulary pain medication, Norco, for Plaintiff's chronic hip pain.  This request was deferred in favor of trying rotating NSAIDs; Ultram 50 mg was approved.  On December 11, 2012, Plaintiff reported to health care complaining of chronic pain, stating that the Ultram was being given too early to help and that his mattress was too hard.  He was informed that he was not eligible for an air mattress.  (Docket no. 347 at 8-9, 11-12, 19; docket no. 376 at 7-13, 18-22.)

On January 11, 2013, Dr. Gopal requested an off-guideline special accommodation for an air mattress due to Plaintiff's hip pain and desire not to use pain medication.   Defendant Stieve deferred this request on January 14, 2013, stating it was not medically necessary.  On February 6, 2013, at an appointment with Dr. Gopal, Plaintiff complained that right hip pain required him to sleep on his left side, which in turn led to pressure sores on his buttock.  Plaintiff asserted that he did not want pain medication but wanted an air mattress.  When Dr. Gopal informed him that the RMO denied his air mattress request, then he stated he wanted pain medication.  Dr. Gopal noted a red area of abrasion on the left buttock which was dry with no active drainage or infection, and tender to the touch.  Dr. Gopal prescribed antibiotic ointment.  On March 7, 2013, Defendant Stieve approved an air mattress for Plaintiff for six months; Plaintiff received the air mattress on March 13, 2013.  (Docket no. 347 at 27; docket no. 376 at 30-37.)

A proposed extension of Plaintiff's special accommodation for an air mattress was deferred on December 5, 2013 by Dr. Borgerding, who reasoned that "air mattresses are considered in cases of decubiti."  The air mattress was removed from Plaintiff's property on December 9, 2013, but it subsequently returned to Plaintiff pursuant to the court's December 19, 2013 order and instructions from Defendant Stieve to MDOC staff in furtherance of that order.  There is no indication that the

named Defendants had any further involvement in Plaintiff's healthcare as it relates to his air mattress. Nevertheless, Plaintiff and the MDOC continued to disagree about Plaintiff's need for an air mattress. On February 6, 2015, the court granted Plaintiff's Motion for Preliminary Injunction and ordered Defendants to provide Plaintiff with an air mattress, which order was subsequently reversed by the Sixth Circuit on March 21, 2016, for an evidentiary hearing. On November 22, 2017, the court determined that an evidentiary hearing was no longer necessary and ordered Defendants to provide Plaintiff with an air mattress until his parole. (Docket no. 81; docket no. 285; docket no. 376 at 56-91.)

In Count Six of the Fourth Amended Complaint, Plaintiff claims that Defendants Stieve, Upston, Miles, and Ouellette knowingly, intentionally, and deliberately denied Plaintiff use of his air mattress, which left Plaintiff "in a lot of pain and has caused him sleepless nights." (Docket no. 305 ¶¶ 218-19.)

Lastly, in Count Seven of the Fourth Amended Complaint, Plaintiff claims that Defendants Stieve and Corizon violated his Eighth Amendment rights by creating, implementing, or instituting various customs, policies, practices, and criteria. (Docket no. 305 ¶¶ 221-24.) Plaintiff seeks injunctive relief and compensatory and punitive damages.

**B. Governing Law**

Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Docket nos. 342, 345.) Summary judgment is appropriate where the moving party shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Covington v. Knox Cnty. Sch. Sys.*, 205 F.3d 912, 915 (6th Cir. 2000). Rule 56 expressly provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

Once the moving party has met its burden of production, the non-moving party must come forward with significant probative evidence showing that a genuine issue exists for trial. *Covington*, 205 F.3d at 915. A mere scintilla of evidence is insufficient to defeat a properly supported motion for summary judgment; rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Ultimately, a district court must determine whether the record as a whole presents a genuine issue of material fact, drawing "all justifiable inferences in the light most favorable to the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)*;* *Hager v. Pike County Bd. Of Educ.*, 286 F.3d 366, 370 (6th Cir. 2002).

**C. Analysis**

*1. Plaintiff's Claims against Defendant Lybarger*

On October 4, 2018, defense counsel filed a Suggestion of Defendant Dawn Lybarger, N.P.'s death on the record, indicating that she passed away on April 2, 2018. (Docket no. 337.) A court may order a substitution of parties due to death "[i]f a party dies and the claim is not extinguished." Fed. R. Civ. P. 25(a)(1). If no motion for substitution is made within 90 days after

a party's death is first suggested on the record, "the action by or against the decedent must be dismissed." *Id.* Defendant Lybarger's death was first suggested on the record on October 4, 2018, and the period to file a motion for substitution lapsed on January 2, 2019, without any motion for substitution filed by Plaintiff or another party. Therefore, Plaintiff's claims against Defendant Lybarger should be dismissed under Rule 25(a).

*2. The MDOC Defendants' Motion for Summary Judgment [342]*

In the Fourth Amended Complaint, Plaintiff makes the following factual allegations against Defendant Stieve:

- On January 2, 2012, Plaintiff sent a letter to Defendant Stieve.
- On January 16, 2012, MDOC's Bureau of Health Care Services responded to the letter on behalf of Defendant Stieve, nothing was done to help Plaintiff.
- On March 13, 2012, Plaintiff filed a grievance, JCF-12-03-0508-12D1, on Stieve, Corizon, and Miles for doing nothing to help relieve Plaintiff's pain and suffering. This grievance was denied.
- On April 25, 2012, Plaintiff sent Defendant Stieve a letter outlining his medical issues, and so did his mother, Mary Smith Szalma.
- On May 22, 2012, Plaintiff's mother, sent letters to Defendant Stieve and Corizon about Plaintiff's serious medical issues that continue to go unaddressed. Neither of them responded or acted to correct the issues.

(Docket no. 305 ¶¶ 119, 122, 149, 161, 162.) Based on these allegations, Plaintiff claims that Defendant Stieve violated the Eighth Amendment by "knowingly, intentionally, and deliberately continu[ing] to deprive Plaintiff use of his" CPAP machine and air mattress. (*Id.* ¶¶ 198, 218.) Plaintiff also claims that Defendant Stieve violated the Eighth Amendment by creating, implementing and instituting policies, customs, practices and/or criteria (1) that delayed and/or denied Plaintiff access to a specialist for evaluation and/or removal of the hardware in his knee by restricting lower and mid-level medical practitioners from authorizing Plaintiff access to a

specialist; (2) "for the use of an air mattress that had denied and interfered with treatment once prescribed;" and (3) that restricted "treating physicians from directly prescribing Plaintiff speciality [sic] care, medications, and medical accommodations by making these physicians seek approval from a MDOC Regional Medical Officer." (*Id*. ¶¶ 221, 223, 224.)

The MDOC Defendants contend that the court should grant summary judgment in favor of Defendant Stieve because Plaintiff did not make any factual allegations showing that Defendant Stieve was personally involved in the complained-of acts, and his claims are premised solely on a theory of *respondeat superior*. (Docket no. 342 at 12-16.) The MDOC Defendants also contend that Plaintiff's allegations against Defendant Stieve regarding a policy, custom, and/or practice are bare allegations insufficient to state a claim. (*Id*. at 15.)

To prevail on a § 1983 claim, a plaintiff must show that the defendant was "personally involved" in the alleged unconstitutional conduct and/or that the defendant "encouraged or condoned others in doing so." *Copeland v. Machulis*, 57 F.3d 476, 481 (6th Cir. 1995) (citing *Rizzo v. Goode*, 423 U.S. 362, 376, 96 S. Ct. 598, 606, 46 L. Ed. 2d 561 (1976); *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)). It is a well-established principle that § 1983 liability cannot be based on a mere failure to act or on a theory of *respondeat superior*. *Salehpour v. Univ. of Tenn.*, 159 F.3d 199, 206-07 (6th Cir. 1998). Claims of supervisory liability will suffice only if the plaintiff alleges and shows that the supervisor personally engaged in or otherwise "authorized, approved, or knowingly acquiesced in the unconstitutional conduct." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quoting *Hays v. Jefferson Cnty., Ky.*, 668 F.2d 869, 874 (6th Cir. 1982)).

Plaintiff argues that Defendants' Motion for Summary Judgment should be denied because Defendant Stieve was directly and personally involved in Plaintiff's loss of his air mattress

accommodation and that his actions were deliberately indifferent.[5] (Docket no. 358.) Specifically, Plaintiff alleges for the first time in Response to Defendants' Motion that his air mattress was taken away after Defendant Stieve told Registered Nurse Karina Beals that Plaintiff did not meet the guidelines. (Docket no. 358 at 22 (citing docket no. 358-2 at 11).) Plaintiff further alleges that Defendant Stieve himself deferred a special accommodation for an air mattress for Plaintiff on the basis that it was not medically necessary. (*Id*. (citing docket no. 358-2 at 33-34).) None of these allegations appear in Plaintiff's Fourth Amended Complaint. (*See generally* docket no. 305.)

"The nature of the notice [pleading] requirement is more demanding at the summary judgment stage than at earlier stages of the litigation, because by this point a plaintiff has had the opportunity to conduct discovery and to amend the complaint to reflect new theories." *Desparois v. Perrysburg Exempted Vill. Sch. Dist.*, 455 F. App'x 659, 665 (6th Cir. 2012). Accordingly, "a plaintiff may not expand his claims to assert new theories for the first time in response to a summary judgment motion;" the proper procedure is to amend the complaint in accordance with Federal Rule of Civil Procedure 15(a). *Id*. at 666 (citing *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007)). *See also Johnson v. Clafton*, 136 F. Supp. 3d 838, 842 (E.D. Mich. 2015) (where plaintiff's claims were premised on allegations appearing not in the complaint but for the first time in response to defendant's summary judgment motion, defendant did not have fair notice of plaintiff's claims, and it was only fair that those claims not be considered in resolving defendant's motion).

[5] Plaintiff also asserts in his Response brief that Defendant Stieve did not move for summary judgment on his Eighth Amendment claim regarding the CPAP machine because it was not addressed in the Motion's statement of facts. (Docket no. 358 at 9-10, 20.) Plaintiff argues that Defendant Stieve's failure to address this claim in his Motion for Summary Judgment "is a concession that a claim for such violation is stated." (*Id*. at 9.) Plaintiff is incorrect. As previously noted, the MDOC Defendants argue that Defendant Stieve is entitled to summary judgment on *all* of Plaintiff's claims because he failed to allege that Defendant Stieve was personally involved in the complained-of acts. (Docket no. 342 at 12-16.)

In the present matter, the Fourth Amended Complaint does not include factual allegations of Defendant Stieve's personal involvement in the deprivation of Plaintiff's air mattress. Thus, Defendant Stieve did not have fair notice that he would have to defend against these allegations, and he could not, and indeed did not, address them in his Motion for Summary Judgment. To the extent that Plaintiff learned of Defendant Stieve's personal involvement in the issue of Plaintiff's air mattress through discovery, he was obligated to amend the complaint to add allegations related thereto, but he did not. Instead, Plaintiff improperly made those allegations for the first time in response to Defendant Stieve's Motion for Summary Judgment, and the court should therefore decline to consider the merits of Plaintiff's deliberate indifference claims against Defendant Stieve related to his personal involvement in the deprivation of Plaintiff's air mattress.

Plaintiff's Eighth Amendment claims against Defendant Stieve are based solely on allegations of a mere failure to act. Plaintiff makes no allegation or argument that Defendant Stieve abandoned the specific duties of his position by failing to respond to or take corrective action on Plaintiff's letters. *See Hill v. Marshall*, 962 F.2d 1209, 1213 (6th Cir. 1992). Moreover, the letters are not attached to the Fourth Amended Complaint and are not otherwise cited by Plaintiff in response to the instant Motion, so there is no indication or evidence that those letters contained information from which Defendant Stieve could have "subjectively perceived facts from which to infer substantial risk" to Plaintiff, as is necessary to prove a claim of deliberate indifference. *See Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). Plaintiff's claims in this regard should therefore be dismissed.

To the extent that Plaintiff alleges that Defendant Stieve violated his Eighth Amendment rights by creating, instituting, and implementing various policies, customs, practices, and/or criteria, those claims should also be dismissed, as they are nothing more than vague allegations

and legal conclusions unsupported by any factual allegation. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.") Notably, Plaintiff does not allege or show that Defendant Stieve was a policymaker within the MDOC or identify any policy created by Defendant Stieve that caused the alleged constitutional violations in this matter. *See Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993). To the extent that Plaintiff alleges that Defendant Stieve improperly relied on the MDOC's air mattress policy in denying Plaintiff's air mattress accommodation, such allegations were raised for the first time in Plaintiff's Response to Defendants' Motion for Summary Judgment, which is procedurally improper, as discussed above.

For these reasons, the MDOC Defendants' Motion for Summary Judgment should be granted with regard to Defendant Stieve and denied as moot with regard to Defendant Upston, who has already been dismissed from this action pursuant to the parties' stipulation.

*3. The Corizon Defendants' Motion for Summary Judgment [345]*

Plaintiff claims that Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. (Docket no. 305.) To support a claim of deliberate indifference under the Eighth Amendment, a Plaintiff must satisfy two components: an objective component, and a subjective component. *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013) (citing *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008)).

"The objective component requires a plaintiff to prove that the alleged deprivation of medical care was serious enough to violate the Eighth Amendment." *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018). A plaintiff meets this requirement by showing that he or she has a serious

medical condition with a serious medical need,[6] and that (1) prison officials failed to provide treatment for the condition; or (2) ongoing treatment for the condition was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Id*. (citing *Miller v. Calhoun Cty.*, 408 F.3d 803, 819 (6th Cir. 2005)). If the plaintiff alleges inadequate treatment, "[t]here must be 'medical proof that the provided treatment was not an adequate medical treatment of [the inmate's] condition or pain," and the plaintiff must "also must place verifying medical evidence in the record to establish the detrimental effect" of the inadequate treatment. *Id*. at 737-38 (citations and internal quotation marks omitted).

Under the subjective component, "a plaintiff must show that the defendants acted with deliberate indifference." *Rhinehart*, 894 F.3d at 738. An official acts with deliberate indifference when he consciously disregards an excessive or substantial risk to inmate health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Thus, the plaintiff must prove "that each defendant 'subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk' by failing to take reasonable measures to abate it." *Rhinehart*, 894 F.3d at 738 (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)).

Differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnosis or treatment are not enough to state a deliberate indifference claim. *Hill v. Haviland*, 68 F. App'x 603, 604 (6th Cir. 2003) (citing *Estelle v. Gamble*, 429 U.S. 97, 107 (1976)). Thus, "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical

---

[6] A sufficiently serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897 (6th Cir. 2004) (emphasis and citations omitted).

judgments and constitutionalize claims which sound in state tort law." *Westlake v. Lucas,* 537 F.2d 857, 860 n.5. Ultimately, the court must consider the wide discretion allowed to prison officials in their treatment of prisoners under authorized medical procedures. *See Westlake,* 537 F.2d at 860. "[W]hether . . . additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment." *Estelle*, 429 U.S. at 107. A decision to not administer a certain form of medical treatment does not represent cruel and unusual punishment. *Id*.

a. CPAP Machine

Plaintiff alleges that Defendants Miles, Ouellette, Boomershine, and Squier were deliberately indifferent to his medical need for a CPAP machine. Defendant Boomershine initially issued a special accommodation for Plaintiff's CPAP machine at intake, but after reviewing Plaintiff's chart and noting that Plaintiff had no sleep study on file and had been using a CPAP machine that apparently had not been prescribed for him, he opined that the use of a CPAP now may be problematic and not in Plaintiff's best interest.

On August 8, 2011, Plaintiff told Defendant Miles that he had not received the CPAP machine because there is no sleep study on file. At their next appointment, Defendant Miles noted that Plaintiff previously used a CPAP machine with good response, that he was awakening with shortness of breath and had difficulty staying asleep. Defendant Miles performed an ESS test, assessed Plaintiff's sleep apnea as good and ordered a sleep study for October 10, 2011. Two weeks later, Defendant Miles conducted a chart review, noted that there was no documented indication or prescription for a CPAP machine, and terminated Plaintiff's special accommodation, but he requested a Respiratory Therapy Evaluation for Sleep Apnea.

Defendant Squier denied Defendant Miles's request, citing no evidence of hypertension and recommended that Plaintiff initiate weight loss, decrease his upper body development, increase his aerobic activity, and continue to be monitored.  Defendant Squier did, however, approve a sleep study at a later date.

At a June 12, 2012 appointment, Defendant Ouellette noted that Plaintiff used a CPAP machine without a sleep study prior to incarceration, that Plaintiff arrived at the MDOC with his CPAP machine, the pulmonary staff at the MDOC's medical facility was unable to obtain any records regarding Plaintiff's CPAP machine from the company from which it was purchased, and that the CPAP machine was therefore not authorized for use by the MDOC's pulmonary clinic. She also noted that a consult for a sleep study was not approved in 2011.  Defendant Ouellette did, however, assess that the Regional Medical Director needs to review past consults and ordered a chronic care appointment with a physician for review of Plaintiff's gastroesophageal reflux disease, knee pain, and "self diagnosed sleep apnea."

Viewing these facts in a light most favorable to Plaintiff, Plaintiff cannot meet the subjective component of deliberate indifference.  The evidence indicates that Defendants Miles and Ouellette acknowledged Plaintiff's complaints of sleep apnea, perceived a lack of supporting documentation for the condition, yet acted within their authority to recommend further evaluation of Plaintiff's symptoms.  In the case of Defendant Miles, he requested that Plaintiff have a sleep study on two occasions, and his inability to have the sleep studies authorized does not support Plaintiff's constitutional claims.  Defendant Ouellette's recommendation that Plaintiff be treated by a physician for his sleep apnea resulted in his subsequent appointment with Dr. Szymanski, who requested sleep study and/or a CPAP machine, and whose request ultimately resulted in the administration of a sleep study and Plaintiff's receipt of a CPAP machine.

With regard to Defendants Boomershine and Squier, the evidence indicates that they acknowledged Plaintiff's complaints but did not subjectively perceive facts from which to infer substantial risk to Plaintiff.  Defendant Boomershine opined that Plaintiff's use of a CPAP may be problematic and not in Plaintiff's best interest.  Defendant Squier cited no evidence of hypertension in her denial of Defendant Miles's request for a sleep study, and at her deposition she further explained that Defendant Miles's request did not demonstrate medical necessity for a test in that it did not indicate that Plaintiff snored or stopped breathing, that anyone had witnessed apneic episodes, or that anyone ever wrote a prescription for a CPAP machine.  (Docket no. 371-5 at 1.) As noted above, "whether . . . additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment."  *Estelle*, 429 U.S. at 107.  And differences in judgment between an inmate and prison medical personnel regarding the appropriate treatment are not enough to state a deliberate indifference claim.  *Hill*, 68 F. App'x at 604 (citing *Estelle*, 429 U.S. at 107).

b.    Kidney Stones

Plaintiff argues that Defendant Miles was deliberately indifferent when he refused to provide him adequate pain medication for his kidney stones in a timely manner.  He argues that Defendant Miles knew or should have known that Plaintiff was prescribed Vicodin at Allegiance Hospital and that Defendant Miles had the opportunity provide him with Vicodin during at least one visit, multiple kites, and requests for chart review and deliberately chose not to do so.  Plaintiff also argues that neither Defendant Miles nor any other doctor saw or treated him for six days after the onset of his kidney stones, despite discharge instructions from Allegiance Hospital to follow up in 3-5 days.  (Docket no. 371 at 35.)

There is no record evidence explaining why Plaintiff did not have an appointment with Defendant Miles until six days after he was diagnosed with kidney stones, and Plaintiff submits no evidence to show that Defendant Miles declined or avoided any appointment requests. Upon seeing Plaintiff on August 8, 2011, the record indicates that Defendant Miles noted Plaintiff's complaints of intense pain and the fact that Plaintiff had not yet received the prescribed Vicodin, and he immediately sent a request for approval of the Vicodin prescription to the Regional Medical Officer (RMO). In the meantime, Defendant Miles also prescribed Pyridium for Plaintiff's pain and ordered a medical detail for continuous access to the toilet. The record indicates that the RMO approved the Vicodin request the next day, and while Plaintiff did not receive the Vicodin until August 12, 2011, there is no indication that Defendant Miles had anything to do with the delay. In fact, the response to Plaintiff's August 11, 2011 kite regarding the status of the Vicodin indicates that his inquiry was forwarded to the pharmacy, not Defendant Miles.

To the extent that Plaintiff argues that Defendant Miles prescribed Pyridium and Naproxen instead of extending the prescription of Vicodin in response to Plaintiff's subsequent requests, the discharge instructions from the hospital indicated a prescription for twenty tablets of Vicodin to be taken orally every six hours or as needed; it did not indicate an indefinite prescription of Vicodin. Essentially, Plaintiff argues that Defendant Miles treated Plaintiff's kidney stone pain with medication, just not the medication that Plaintiff preferred. Plaintiff's "disagreement with the physicians' prescriptions does not implicate the Eighth Amendment." *Hearington v. Pandya*, 689 F. App'x 422, 427 (6th Cir. 2017). *See also Thomas v. Coble*, 55 F. App'x 748, 749 (6th Cir. 2003); *Baker v. Stevenson*, No. 12-cv-15290, 2014 WL 11309773, at *6-7 (E.D. Mich. Mar. 31, 2014), *aff'd*, 605 F. App'x 514 (6th Cir. 2015); *Carter v. Michigan Dep't of Corr.*, No. 12-cv-12621, 2013 WL 5291567, at *4 (E.D. Mich. Sept. 19, 2013), *aff'd* (Sept. 26, 2014) ("Selecting

the appropriate medication for a patient is a classic example of a matter for medical judgment, which may rise to medical malpractice but not deliberate indifference.") (citation and internal quotation marks omitted); *Schweiger v. Corr. Med. Servs., Inc.*, No. 11-15345, 2012 WL 7767245, at *6 (E.D. Mich. Aug. 15, 2012), *report and recommendation adopted*, No. 11-15345, 2013 WL 1148443 (E.D. Mich. Mar. 19, 2013). Moreover, Plaintiff does not indicate that the Pyridium or the Naproxen were any less effective than the Vicodin.

With regard to Plaintiff's argument that neither Defendant Miles nor any other provider saw Plaintiff until six days after the onset of his kidney stones and not within the three to five days indicated in the hospital's discharge instructions, Plaintiff fails to "place verifying medical evidence in the record to establish the detrimental effect of the [one-day] delay in medical treatment." *Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir. 2001).

It is also noteworthy that one week after Plaintiff sent a kite to see a specialist for his kidney stones, Defendant Miles submitted a request for a urology evaluation for RMO approval. While this request was deferred by Defendant Squier, the fact that Defendant Miles submitted the request does not support Plaintiff's constitutional claims against him. Plaintiff's has not demonstrated that Defendant Miles was deliberately indifferent with regard his kidney stones.

Plaintiff argues that Defendant Squier was deliberately indifferent to his medical needs when she denied Defendant Miles's request for a urology evaluation. Instead of approving a urology evaluation, Defendant Squier ordered an alternative treatment plan for further testing – that Plaintiff undergo another urinalysis and if blood was present, an imaging study. Defendant Squier's prescribed course of treatment was not so grossly inadequate to shock the conscience. *See Rhinehart*, 894 F.3d at 737.

c. <u>AFO Brace</u>

Plaintiff claims that Defendants Miles and Ouellette were deliberately indifferent to his medical needs when they refused to order Plaintiff a new AFO brace to help with his right foot drop and interfered with Plaintiff's use of his AFO brace. He claims that Defendants' refusal to allow him to use his AFO brace left him at a potential risk of serious harm. Specifically, Plaintiff argues that he struggled to walk and was in a constant fear of falling and the possible injuries that could result therefrom.

As an initial matter, while Plaintiff claims that Defendant Ouellette was deliberately indifferent in this regard, Plaintiff has submitted no evidence that Defendant Ouellette was involved in treating or failing to treat his right foot drop. (*See* docket no. 380.) Notably, Plaintiff's Response to Defendants' Motion for Summary Judgment regarding his AFO brace focuses only on Defendant Miles and makes no mention of Defendant Ouellette. (*See* docket no. 371 at 36-37.) Accordingly, Defendant Ouellette is entitled to summary judgment on Plaintiff's claims of deliberate indifference regarding his AFO brace.

Plaintiff asserts that he was prescribed an AFO brace for his right foot drop to aid his mobility. (Docket no. 371 at 22 (citing docket no. 380 at 1-3).) The medical records that Plaintiff cites are from two appointments that he had with orthopedic specialists in April 2001. The doctors noted that Plaintiff had a foot drop for which he was using a lift in his right shoe but that he was not using an AFO brace because he found it easier and more convenient not to use the brace. The doctor found that regular or constant use of a cane in the left hand would be helpful given Plaintiff's mechanical abnormalities and issued a prescription for and provided Plaintiff with a standard cane. Neither doctor prescribed an AFO brace.

Plaintiff argues that Defendant Miles was deliberately indifferent to his need for an AFO brace and at times did not even document Plaintiff's requests for an AFO brace in his treatment notes. Indeed, the only one of Defendant Miles's treatment notes documenting Plaintiff's requests for an AFO brace was from Plaintiff's June 17, 2011 appointment at which he examined Plaintiff's right foot and noted decreased muscle strength and a blister on the plantar surface of Plaintiff's big toe. Defendant Miles's treatment notes from Plaintiff's August 8, 2011, August 24, 2011, September 12, 2011, September 26, 2011, October 21, 2011, February 1, 2012 and March 13, 2012 appointments document Plaintiff's complaints related to his kidney stones, left knee, sleep apnea, and air mattress, but they do not contain any complaints about his AFO brace.

What Plaintiff does not mention, however, is that he was provided with a shoe lift and a cane upon intake at RGC and that he was also issued a medical detail for a cane upon intake at RGC and transfer to JCF. That detail on May 27, 2011, and Defendant Miles ordered another medical detail for a cane beginning August 8, 2011 through November 8, 2011. (Docket no. 379 at 12-14; docket no. 380 at 7, 9, 18-19.) Plaintiff has produced no evidence that he had a prescription for an AFO brace, and the evidence shows that Defendant Miles prescribed him with a cane, which accords with the orthopedic specialist's prescribed treatment for Plaintiff's right foot drop. "There must be medical proof that the provided treatment was not an adequate medical treatment of [the inmate's] condition or pain." *Rhinehart*, 894 F.3d at 737-38. Plaintiff has submitted no such proof. Defendant Miles should therefore be granted summary judgment with respect to this issue.

d. <u>Left Knee Brace and Hardware</u>

Plaintiff claims that Defendants Miles and Ouellette deliberately denied Plaintiff use of his left knee brace, which left him at a potential risk of severe harm. He also claims that Defendants

Corizon, Miles, Ouellette, Boomershine, and Squier were deliberately indifferent when they denied Plaintiff surgery to get the hardware from his knee removed for two years, failed to listen to his complaints about extreme pain and failed to follow the discharge instructions from the hospital that he needed to get the hardware removed within a year.[7]

On March 14, 2011, Plaintiff had a consult with a physician in Detroit Receiving Hospital's Orthopaedic Clinic to request removal of his left knee hardware. The physician approved the surgery and indicated that it would hopefully be performed within the next month. He also prescribed Plaintiff with a "patellar stabilizing brace." Plaintiff asserts that he was transferred from the Wayne County Jail to the MDOC on March 16, 2011, before he could obtain the brace or have the surgery; however, the RGC intake records indicates that Plaintiff arrived at RGC with a knee brace. In his affidavit, Plaintiff attests that when he was transferred from the Wayne County Jail to the MDOC, he was using a standard locking proviso knee brace, not a stabilizing brace, and that he used that brace until he received the knee hardware removal surgery in March of 2013. (Docket no. 371 at 17; docket no. 371-2 ¶¶ 16-17; docket no. 377 at 1-4; docket no. 378 at 1-4.)

With regard to Defendant Boomershine, the record indicates that he assessed Plaintiff's condition at intake to RGC and before his transfer to JCF. At intake, on March 17, 2011, Defendant Boomershine examined Plaintiff and noted "[s]light bossing L medial knee fixation device." The only other involvement that Defendant Boomershine had concerning Plaintiff's left knee condition was on September 1, 2012, when he informed Plaintiff of Defendant Squier's alternative treatment plan for his left knee. In the Fourth Amended Complaint, Plaintiff alleges that Defendant Boomershine told him at that appointment, "I'm just a PA, I can't do anything for you. . . . My job today is just to deliver the message about the 407 (hardware removal denial) and I've done that."

[7] Plaintiff does not cite evidence of these discharge instructions, and the Court finds none.

Plaintiff does not show how, on these limited facts and allegations, Defendant Boomershine was deliberately indifferent to his knee condition and does not make any argument in opposition to Defendants' Motion for Summary Judgment in this regard.

With regard to Defendant Miles, Plaintiff argues that he took no action regarding Plaintiff's left knee hardware or brace at their first appointment on August 8, 2011 or at subsequent appointments in August and September 2011. Plaintiff argues that Defendant Miles knew of Plaintiff's need for a stabilizing brace and hardware removal but did nothing except order follow up appointments and did not order the prescribed brace but only put in a repair request for Plaintiff's existing brace. He argues that Defendant Miles "undoubtedly chose to leave [him] to suffer in constant pain with no medical attention and was deliberately indifferent to his medical needs." (Docket no. 371 at 38, 40-41.)

At Plaintiff's first appointment with Defendant Miles on June 17, 2011, Defendant Miles recorded Plaintiff's assertion that an orthopedic specialist told him that his left knee hardware had to be removed. Defendant Miles examined Plaintiff's knee, noted that it was positive for deformity with palpable hardware tenting the skin at the level of the tibial plateau. He then placed an order to obtain Plaintiff's medical records. At Plaintiff's next appointment with Defendant Miles, on August 8, 2011, Defendant Miles acknowledged Plaintiff's knee pain, examined Plaintiff's knee and noted that it was positive for anterior drawer sign and Varus and valgus stress, ordered x-rays, and scheduled a follow up appointment regarding Plaintiff' left knee hardware, among other things. There is no indication that Plaintiff asked Defendant Miles to replace his knee brace at either of these two appointments or at his next two appointments on August 24, 2011 and September 12, 2011, which only concerned his kidney stones. At their October 21, 2011 appointment, Plaintiff complained of knee pain and discussed his prescription for a knee brace,

which Defendant Miles acknowledged and prescribed Celebrex for Plaintiff's pain. On November 2, 2011, Defendant Miles indicated that Plaintiff's knee brace was in need of repair and submitted a repair request. Dr. William Borgerding ultimately deferred the request because there was no evidence of ligamentous instability on exam. And on November 10, 2011, Defendant Miles requested that Plaintiff have an orthopedic evaluation for removal of the knee hardware.

Pertinent here is that Plaintiff had a knee brace during his course of treatment with Defendant Miles (and the other defendants), just not the exact brace prescribed by the orthopedic physician. Plaintiff provides no medical proof that the standard locking proviso brace that Plaintiff was using was any less adequate than a stabilizing brace would have been. *See Rhinehart*, 894 F.3d at 737-38 ("There must be medical proof that the provided treatment was not an adequate medical treatment of [the inmate's] condition or pain."). In any case, Doctor Borgerding found that repair of Plaintiff's standard locking proviso brace was not medically necessary based on the examination findings.

Moreover, the evidence shows that Defendant Miles was not deliberately indifferent to Plaintiff's knee pain. He assessed Plaintiff's knee, ordered Plaintiff's medical records, ordered x-rays, prescribed pain medication, requested repair of his existing brace, and requested an orthopedic evaluation for removal of Plaintiff's left knee hardware. Where, like here, "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and constitutionalize claims which sound in state tort law." *Westlake*, 537 F.2d at 860 n.5. This court should be so reluctant with regard to Plaintiff's claim against Defendant Miles.

At a June 12, 2012 appointment with Defendant Ouellette, Plaintiff reported constant severe left knee pain, which included aching, burning, pinching, swelling; all aggravated by

walking and standing.  On examination, Defendant Ouellette noted that Plaintiff had a left-sided limp, that he ambulated with a cane, minimal swelling and mild crepitus in Plaintiff's left knee but that it was non-tender to palpation, and that Plaintiff was able to cross his left leg.  Defendant Ouellette ordered an ice detail and instructed Plaintiff to continue his current medication and follow an exercise program.  She also scheduled a Chronic Care Clinic appointment with a physician to address Plaintiff's knee pain.  Additionally, on July 2, 2012, Defendant Ouellette also ordered x-rays of Plaintiff's left knee.

Plaintiff argues that he informed Defendant Ouellette of his constant pain and ligamentous instability, which were needed for a knee brace request and that she did not document his instability and made no effort to provide him with a knee brace but instead ordered an ice detail.  (Docket no. 371 at 41.)  "[W]hether . . . additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment."  *Estelle*, 429 U.S. at 107.  Here, Defendant Ouellette's treatment notes do not document Plaintiff's complaints of instability or a request for a knee brace.  But it does show that she acknowledged Plaintiff's complaints of constant pain, examined Plaintiff's knee with mild results, and ordered an ice detail and x-rays.  The record does not indicate that Defendant Ouellette subjectively perceived facts from which to infer that Plaintiff faced substantial risk without a knee brace.  Plaintiff cannot meet the subjective component of deliberate indifference on this claim against Defendant Ouellette.

On December 9, 2011, Defendant Squier denied Defendant Miles's request for an orthopedic evaluation for the removal of Plaintiff's left knee hardware, reasoning that there was no medical necessity for the procedure at that time.  In doing so, she relied on the normal results from Plaintiff's December 5, 2011 physical examination and further reasoned that "[m]edications and surgery are far less effective for symptom relief than weight loss."  Defendant Squier denied

a similar request from Dr. Szymanski on August 2, 2012, again finding that medical necessity was not demonstrated. She reasoned that the most common reasons for hardware removal – infection and failure – were not present on the x-rays and that hardware removal was no guarantee of pain relief and generally not medically necessary. Her alternative plan was to perform further testing, which was performed and returned normal results. Dr. Sudhir submitted another orthopedic consultation request in October 2012, which Defendant Squier authorized. Plaintiff was then seen by an orthopedic surgeon who recommended physical therapy for strengthening followed by surgical removal of the hardware. On March 5, 2013, following the recommended course of physical therapy, Dr. Squier approved the surgical removal of the hardware, which was removed on March 21, 2013.

As noted above, "whether . . . additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment." *Estelle*, 429 U.S. at 107. To the extent that Defendant Squier's decisions to deny Dr. Miles's and Dr. Szymanski's requests for orthopedic consultations as medically unnecessary and in favor of alternative treatment were incorrect or misguided, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. 105.

e. Air Mattress

Plaintiff claims that Defendants Miles and Ouellette knowingly, intentionally, and deliberately denied him the use of his air mattress, which left him "in a lot of pain and . . . caused him sleepless nights." As previously discussed, Plaintiff saw Defendant Ouellette for a chronic care visit on June 12, 2012. Plaintiff argues that Defendant Ouellette had access to all of Plaintiff's prior medical records at this visit, including records documenting his chronic hip and back pain, but she did not issue him an air mattress. The medical record indicates that Plaintiff complained

of GERD, left knee pain, and sleep apnea at his visit with Defendant Ouellette; he did not complain of chronic back and hip pain.  Notably, Plaintiff did not ask Defendant Ouellette to give him an air mattress, and she did not otherwise deny him one.  From this visit with Plaintiff, it cannot be said that Defendant Ouellette subjectively perceived facts from which to infer substantial risk to Plaintiff if he did not have an air mattress, that she did in fact draw the inference, and that she then disregarded that risk.  *See Rhinehart*, 894 F.3d at 738.  Additionally, the alleged fact that Defendant Ouellette did not comb through Plaintiff's extensive medical record to find, assess, and provide solutions for the hip and back pain that Plaintiff did not complain of at their appointment does not amount to deliberate indifference.

Defendant Miles met with Plaintiff on March 13, 2012, in response to Plaintiff's kite for an air mattress.  (Docket no. 346 at 73.)  At that visit, Defendant Miles acknowledged Plaintiff's complaint that the special accommodation for his air mattress was discontinued.  Defendant Miles also recorded Plaintiff's assertions that he had a total right hip replacement and hardware in his left knee and that he experienced severe hip and back pain without the air mattress.  Defendant Miles informed Plaintiff that he did not meet the criteria for an air mattress and did not return Plaintiff's air mattress.  Plaintiff argues that Defendant Miles improperly applied the MDOC's air mattress guidelines in making this determination.  "A doctor's errors in medical judgment or other negligent behavior do not suffice to establish deliberate indifference."  *Rhinehart*, 894 F.3d at 738.  Accordingly, to the extent that Defendant Miles misapplied the guidelines in determining that Plaintiff was not eligible for an air mattress, his actions do not rise to the level of a constitutional violation.

f.      Defendant Corizon

Plaintiff claims that Defendant Corizon violated his Eighth Amendment rights by "knowingly, intentionally, and deliberately deny[ing] Plaintiff surgery to get the hardware from his knee removed for two years." (Docket no. 305 ¶ 214.) He also argues that Defendant Corizon violated the Eighth Amendment by creating, implementing and instituting policies, customs, practices and/or criteria that (1) delayed and/or denied Plaintiff access to a specialist for evaluation and/or removal of the hardware in his knee by restricting lower and mid-level medical practitioners from authorizing Plaintiff access to a specialist; and (2) was "designed to delay and/or deny Plaintiff access to his orthopedic surgeon for the removal or hardware." (*Id*. ¶¶ 221-22.) Contrarily, in his Response to Defendants' Motion for Summary Judgment, Plaintiff argues that Corizon did *not* have a specific policy regarding knee hardware removal, which caused inaction by its employees due to a lack of guidance. (Docket no. 371 at 39-40.) Plaintiff seemingly seeks to argue the policy issue both ways to see which one sticks.

To establish § 1983 liability against a corporation, whether public or private, a plaintiff must show that the defendant implemented a policy, custom, or practice that caused a deprivation of the Plaintiff's Eighth Amendment rights. *Starcher v. Corr. Med. Sys., Inc.*, 7 F. App'x 459, 465 (6th Cir. 2001) (citing *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 818 (6th Cir. 1996)); *Garner v. Memphis Police Dep't*, 8 F.3d 358, 363-64 (6th Cir.1993) (a plaintiff must identify the policy, connect the policy to the defendant, and show that the particular injury was caused because of the execution of that policy). Thus, to support his claim, Plaintiff must show that his Eighth Amendment rights were violated and that the violation was caused by Defendant Corizon's policy, custom, or practice. *See Hullett v. Smiedendorf*, 52 F.Supp.2d 817, 828 (W.D. Mich. 1999).

Plaintiff's policy allegations are conclusory, and they fail to sufficiently identify any policy, practice, or procedure of Defendant Corizon that violated Plaintiff's Eighth Amendment rights. And at this summary judgment stage of the litigation, Plaintiff fails to identify the policies at issue with any specificity, fails to connect them to Defendant Corizon, and fails to provide any evidence that the policies caused the alleged delay and/or denial of Plaintiff's access to a specialist for evaluation and/or removal of the hardware in his knee. Instead of supporting his claims, Plaintiff makes an about face and seemingly raises a new claim by arguing that Defendant Corizon did not have a policy in place regarding knee hardware removal. This is procedurally improper. For these reasons, Defendant Corizon should be granted summary judgment on Plaintiff's Eighth Amendment claims.

Each of Plaintiff's deliberate indifference claims contain the same general fact pattern – that Plaintiff did not receive the type of medical treatment that he requested, preferred, or believed was necessary, when he wanted it. Because differences in judgment between an inmate and prison medical personnel regarding the appropriate treatment are not enough to state a deliberate indifference claim, the Corizon Defendants' Motion for Summary Judgment should be granted.

**D.     Conclusion**

For the reasons stated herein, Defendant Lybarger should be dismissed from this action pursuant to Federal Rule of Civil Procedure 25, the MDOC Defendants' Motion for Summary Judgment (docket no. 342) should be **GRANTED** with regard to Plaintiff's claims against Defendant Stieve and **DENIED** as moot with regard to Plaintiff's claims against Defendant Upston, the Corizon Defendants' Motion for Summary Judgment (docket no. 345) should be **GRANTED**, and this matter should be dismissed in its entirety.

## III. NOTICE TO PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Eastern District of Michigan Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *U.S. v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n Of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Any objections must be labeled as "Objection #1," "Objection #2," etc. Any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains. Not later than fourteen days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity. The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.

Dated: August 27, 2019

s/ Mona K. Majzoub
MONA K. MAJZOUB
UNITED STATES MAGISTRATE JUDGE

**PROOF OF SERVICE**

I hereby certify that a copy of this Report and Recommendation was served upon counsel of record on this date.

Dated: August 27, 2019

s/ Leanne Hosking
Case Manager