UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RICHARD BOONE, II,

        Plaintiff,

        v.

DANIEL HEYNS ET AL.,

        Defendants.

_____/

Case No. 12-14098

SENIOR U.S. DISTRICT JUDGE
ARTHUR J. TARNOW

U.S. MAGISTRATE JUDGE
MONA K. MAJZOUB

**ORDER ADOPTING IN PART REPORT AND RECOMMENDATION [387]; OVERRULING IN PART AND SUSTAINING IN PART PLAINTIFF'S OBJECTIONS TO REPORT AND RECOMMENDATION [390]; DENYING DEFENDANT STIEVE'S MOTION FOR SUMMARY JUDGMENT [342]; GRANTING IN PART AND DENYING IN PART DEFENDANTS BOOMERSHINE, CORIZON, MILES, OUELLETTE AND SQUIRE'S MOTION FOR SUMMARY JUDGMENT [345]**

On September 9, 2012, Plaintiff Richard Boone, II, filed this 42 U.S.C. § 1983 prisoner civil rights action against employees of Corizon Health, Inc. ("Corizon") and the Michigan Department of Corrections ("MDOC") for Eighth and Fourteenth Amendment violations. On May 21, 2018, Plaintiff filed a Fourth Amended Complaint [305] alleging only Eight Amendment violations. On January 25, 2019, the MDOC Defendants, former Chief Medical Officer (CMO) Jeffrey Stieve, M.D. and Registered Nurse (RN) Brenda Upston[1] filed a Motion for Summary Judgment [Dkt. #342]. On March 19, 2019, Plaintiff filed a Response [358], and on March 27,

---

[1] The parties stipulated to the dismissal of Defendant Upston. (ECF No. 366).

2019, Defendant Stieve filed a Reply [367]. On January 28, 2019, Defendants Corizon, Richard Miles, M.D., Harriet Squier, M.D., Margarette Ouellette, P.A., and Mark Boomershine, P.A. ("the Corizon Defendants") filed Motion for Summary Judgment [345]. On March 28, 2019, Plaintiff filed a Response [371]. On April 9, 2019, the Corizon Defendants filed a Reply [381], and Plaintiff filed a Sur-Reply [385] on April 22, 2019, with leave of court. On August 27, 2019, the Magistrate Judge issued a Report and Recommendation ("R&R") [387] recommending that the Court grant Defendants' motions and dismiss the case. Plaintiff filed Objections [390] to the R&R on September 29, 2019. The Corizon Defendants filed a Response [393] on October 11, 2019. Defendant Stieve filed a Response [392] on October 10, 2019.

For the reasons stated below, the R&R [387] is **ADOPTED in part**; Plaintiff's Objections [390] are **SUSTAINED in part and OVERRULED in part**; the MDOC Defendants' Motion for Summary Judgment [342] is **DENIED** with regard to Plaintiff's claims against Defendant Stieve and **DENIED AS MOOT** with regard to Plaintiff's claims against Defendant Upston; and the Corizon Defendants' Motion for Summary Judgment [345] is **GRANTED in part and DENIED in part**.

## FACTUAL AND PROCEDURAL BACKGROUND

The Court adopts the facts of this case as set forth in the R&R:

## A. Background

Plaintiff was initially incarcerated within the custody of the MDOC in May 2003 and released on parole in 2008. On October 21, 2009, Plaintiff attempted to rob a store and while fleeing the scene of the crime, he fell in a ditch and fractured his left tibial plateau, among other things. Plaintiff was arrested and treated for his injuries at Botsford Hospital and then confined in the Wayne County Jail until March 16, 2011, when he was returned to the custody of the MDOC. The events giving rise to the Fourth Amended Complaint allegedly occurred between March 2011 and September 2012, while he was incarcerated at the Charles Egeler Reception and Guidance Center (RGC) and the G. Robert Cotton Correctional Facility (JCF), both of which are located in Jackson, Michigan[2]. Generally, Plaintiff alleges that Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment by denying him adequate medical care for sleep apnea, kidney stones, right foot drop, residual left knee problems following surgery on his left tibia, and the complications and residual effects of a total right hip replacement. (Docket no. 305.)

### 1. *Sleep Apnea*

Plaintiff experienced episodes of obstructive sleep apnea while being treated at Botsford Hospital in October 2009. (Docket no. 305 ¶ 24; docket no. 375 at 1.) He received a continuous positive airway pressure (CPAP) machine from his mother to use for the sleep apnea while at the hospital, and he was discharged to the Wayne County Jail with instructions to continue using the CPAP machine at night. (Docket no. 305 ¶ 24; docket no. 375 at 2, 4.) Medical staff at the Wayne County Jail allowed Plaintiff to continue using the CPAP machine. (Docket no. 305 ¶ 25.)

Plaintiff was transferred to RGC on March 16, 2011, with his CPAP machine, but it was taken from him upon intake to be x-rayed and evaluated for medical necessity. (Docket no. 305 ¶¶ 30-31; docket no. 375 at 7.) Defendant Boomershine initially ordered a special accommodation for Plaintiff's CPAP machine, but after Plaintiff told the Respiratory Staff that he had not had a sleep study, it was withheld

---

[2] Plaintiff was paroled in 2018.

from Plaintiff pending review of Plaintiff's documentation therefor. (Docket no. 305 ¶¶ 32-34; docket no. 375 at 7.) Plaintiff provided the MDOC with his 2009 records from Botsford Hospital, but Defendant Boomershine told Respiratory Staff to continue withholding the CPAP machine until he followed up with Plaintiff. (Docket no. 305 ¶¶ 34-35; docket no. 375 at 8.) A subsequent kite response indicated that the CPAP machine was being withheld for lack of a sleep study and proper documentation. (Docket no. 305 ¶¶ 38-39; docket no. 375 at 9.) Defendant Boomershine reviewed Plaintiff's chart on April 12, 2011, and noted that Plaintiff had no sleep study on file and had been using a CPAP machine that apparently had not been prescribed for him. (Docket 375 at 14.) Defendant Boomershine opined that the use of a CPAP now may be problematic and not in Plaintiff's best interest. (Id.) The CPAP machine was not returned to Plaintiff.

Plaintiff was transferred to JCF on April 27, 2011. (Docket no. 305 ¶ 41.) He sent a medical kite regarding sleep apnea, an inability to sleep, tiredness, and irritability on June 8, 2011. He was seen in response to this kite on June 9, 2011, and the medical provider sent an email to the nursing supervisor and Housing Unit Manager (HUM) to address the issue of Plaintiff's CPAP machine. (Docket no. 305 ¶¶ 49; docket no. 375 at 15-16.) On August 8, 2011, Plaintiff had an appointment with Defendant Miles, and he told Defendant Miles that he had not received the CPAP machine because there is no sleep study on file. (Docket no. 375 at 18). Plaintiff had another appointment with Defendant Miles on September 26, 2011, at which Defendant Miles noted that Plaintiff had previously used the CPAP machine with good response, that he was awakening with shortness of breath and had difficulty staying asleep. (*Id.* at 21-23.) Defendant Miles gave Plaintiff an Epworth Sleepiness Scale ("ESS") test[3]; and Plaintiff scored a 12. (*Id.*) Defendant Miles assessed Plaintiff's sleep apnea as good and ordered a sleep study for October 10, 2011. (*Id.*) Plaintiff had another visit with Defendant Miles on October 21, 2011, who noted that Plaintiff's sleep apnea was a chronic problem, but there was no notation regarding scheduling a sleep study. (*Id.* at 24-25.) Defendant Miles conducted a chart review on October 25, 2011, noted that there was no documented indication or prescription for a CPAP machine, and he

[3] Plaintiff explains that the ESS was developed in 1990 to assess daytime sleepiness, and a "normal" ESS score ranges from 0-10. (Docket no. 371 at 8 n.4 (citing https://epworthsleepinessscale.com/about-the-ess/).)

terminated Plaintiff's SA therefore. (*Id.* at 26-27.) Defendant Miles requested a Respiratory Therapy Evaluation for Sleep Apnea on October 28, 2011. (*Id.* at 28-291-23.) Defendant Squier denied Defendant Miles's request on November 3, 2011, citing no evidence of hypertension and recommended that Plaintiff initiate weight loss, decrease his upper body development, increase his aerobic activity, and continue to be monitored. (*Id.* at 30-31.)

At a January 6, 2012 and April 23, 2012 medical appointments, Plaintiff reported difficulty initiating/maintaining sleep, and gasping during sleep, and his ESS score increased to 18. Defendant Lybarger assessed Plaintiff's sleep apnea as fair but noted that Plaintiff did not meet the criteria for a sleep study. On April 23, 2012, Defendant Lybarger ordered a CPAP machine for Plaintiff. Plaintiff requested a sleep study on May 16, 2012. At a June 12, 2012 appointment, Defendant Ouellette noted that Plaintiff used a CPAP machine without a sleep study prior to incarceration and that a consult for a sleep study was not approved in 2011. On July 24, 2012, Plaintiff kited that he awakes gasping for air. On July 27, 2012, Dr. Michael Szymanski indicated that he would request use of a CPAP machine or formal testing for sleep apnea if the CPAP was deferred, and he made that request on July 31, 2012. Defendant Stieve deferred Dr. Szymanski's request with instructions to confirm that Plaintiff's CPAP machine was still in storage, get external records but if not available consider sleep study, and encourage weight loss. (Docket no. 375 at 39-61.)

Plaintiff initiated this lawsuit on September 9, 2012. In Count 1 of the Fourth Amended Complaint, Plaintiff claims that Defendants Miles, Lybarger, Ouellette, Boomershine, Stieve, and Squier knowingly, intentionally, and deliberately deprived Plaintiff use of his CPAP machine by refusing to follow Botsford Hospital's discharge instructions and refusing to listen to Plaintiff's complaints about his need for a CPAP to relieve pain and get some sleep. Plaintiff claims that Defendants' denial of the CPAP machine has caused him "unnecessary and wanton infliction" of physical, mental, and emotional pain and suffering, and deprived him of oxygen and sleep, in violation of the Eighth Amendment. (Docket no. 305 ¶¶ 198-99.)

On October 11, 2012, Defendant Squier approved Plaintiff for a sleep study, which was performed on November 14, 2012. The sleep study report, dictated on January 15, 2013, indicated diagnoses of obstructive sleep apnea, significant nocturnal hypoxemia, and possible associated central apnea, and it recommended clinical correlation and

implementation of an auto set CPAP machine. The CPAP machine was approved on February 4, 2013, and on February 6, 2013, a Special Accommodation for the CPAP was issued with no stop date and the CPAP was provided to Plaintiff. (Docket no. 375 at 76-79, 85-87, 92-94.)

### 2. Kidney Stones

Plaintiff presented to MDOC healthcare in the early morning hours of August 2, 2011, with abdominal pain and an inability to urinate. Defendant Miles examined Plaintiff and ordered that he be taken to Allegiance Hospital. An abdominal CT scan revealed a five-millimeter kidney stone and a four-millimeter kidney stone. Plaintiff was discharged from the hospital with prescriptions for Flomax and Vicodin and was told to "[a]rrange for a follow up appointment . . . in 3-5 days or immediately if symptoms get worse." Plaintiff was discharged to the MDOC's Duane L. Waters Health Center, where orders for the Flomax and Vicodin were given. Upon Plaintiff's return to JCF, a nurse noted that Plaintiff would see a medical service provider on August 3, 2011 for a follow up and a possible order of medication. An August 3, 2011 Clinical Progress Note generated at 8:40 a.m. indicates that a hand-written prescription for Vicodin was received, Vicodin requires an approval from a Regional Medical Officer, and a copy of the prescription and a chart review 7 request were forwarded to Defendant Miles for review. (Docket no. 305 ¶¶ 60-63; docket no. 379 at 1-9.)

Plaintiff sent a kite on August 3, 2011 at 11:32 p.m., inquiring about his follow up appointment and the pain medication that still not been administered. The kite response states, "RMO needed for Vicodin. There has been a note forwarded to the MSP regarding this." An August 5, 2011 Administrative Progress Note indicates that the request for RMO approval for Vicodin was still pending. Plaintiff had an appointment with Defendant Miles on August 8, 2011, at which Defendant Miles noted that Plaintiff was still in intense pain, the stones had still not passed, and Plaintiff had not received his Vicodin. Defendant Miles ordered Pyridium[4] for Plaintiff, ordered that Plaintiff have continuous access to a toilet from August 8, 2011 to August 22, 2011, and requested approval of the Vicodin prescription. The Vicodin

---

[4] Plaintiff explains that Pyridium is a drug prescribed to numb or ease pain associated with urination while attempting to pass a kidney stone. (Docket no. 371 at 20 n.20 (citation omitted).)

was approved on August 9, 2011. On August 12, 2011, Boone still had not received the Vicodin and sent a kite. The Vicodin was administered to Plaintiff on August 12, 2011 through August 19, 2011 – ten days after Allegiance Hospital prescribed it and three days after MDOC approval. (Docket no. 379 at 4, 10-17.)

Plaintiff was still complaining of kidney stone pain at an appointment with Defendant Miles on August 24, 2011, so Defendant ordered Pyridium for Plaintiff through August 29, 2011, and Naproxen through October 24, 2011. Over the next few weeks, Plaintiff sent kites requesting extension of his medical detail for continual access to the toilet. Medical records indicate that the medical detail was extended from August 23, 2011 through September 6, 2011, and then again through September 13, 2011. On September 12, 2011, Defendant Miles extended Plaintiff's toilet detail through October 3, 2011, and requested a urology evaluation. (1424-27). Defendant Squier denied the request for a urology evaluation on September 26, 2011, in favor of an alternative treatment plan to repeat a urinalysis, and if blood was present, to consider an imaging study. Defendant Squier reasoned that four-millimeter stones usually passed on their own. A urinalysis was conducted on October 4, 2011, which was negative for blood. Plaintiff continued to complain of kidney stone pain and intermittent episodes of urinary frequency at October 21, 2011 and November 10, 2011 appointments with Defendant Miles, and Defendant Miles ordered another urinalysis. On November 22, 2011, Plaintiff was still experiencing decreased urine and lower abdominal pain, and the treating medical provider sent a request for Flomax, which was deferred in favor of a formulary alpha blocker. Defendant Lybarger prescribed the alpha blocker, Cardura, on December 5, 2011. (Docket no. 346 at 30, 59-61; docket no. 379 at 19-38.)

Plaintiff continued to complain of left flank pain from his from kidney stones at a chronic care appointment on January 6, 2012, but he was negative for cloudy urine, decreased stream, decreased urine output, dysuria, foul urine odor, frequent urination, groin mass, nocturia, and urinary hesitancy. He did not have any genitourinary complaints at his February 1, 2012 appointment with Defendant Miles. An October 11, 2012 urinalysis revealed a trace amount of blood. Plaintiff asserts that his kidney stones finally passed in May or June 2013 – two years after their onset. (Docket no. 346 at 70-71; docket no. 379 at 40-49.)

In Count Two of the Fourth Amended Complaint, Plaintiff claims that Defendants Miles, Lybarger, and Squier knowingly, intentionally, and deliberately denied him "timely access to his medication and an [sic] urologist in compliance with his medical instructions," which left him in unnecessary pain, in violation of the Eighth Amendment. (Docket no. 305 ¶¶ 202-03.)

### 3. Ankle Foot Orthosis (AFO) Brace

Plaintiff asserts that he was severely injured in a car accident at age fourteen, which resulted in right foot drop or right foot palsy. He asserts that he cannot move four toes or his right foot as a result and that he was prescribed an AFO brace to aid his walking. (Docket no. 371 at 22 (citing docket no. 380 at 1-3).) In an affidavit submitted with his Response to the Corizon Defendants' Motion for Summary Judgment, Plaintiff attests that he told the MDOC medical staff about his right foot drop during his initial incarceration and was subsequently issued two soft AFO braces. (Docket no. 371-2 ¶¶ 1-5.) When those braces wore out, the MDOC provided him with a third AFO brace. (Id. ¶ 6.) He continued to use the third AFO brace while on parole in 2008 and later received an order in the Wayne County Jail for the continued use of the AFO brace. (Id. ¶¶ 7-8.)

Plaintiff returned to MDOC custody on March 16, 2011, wearing the third soft AFO brace, which he attests was in a state of complete disrepair. (Docket no. 371-2 ¶ 9.) On March 17, 2011, Plaintiff met with Defendant Boomershine, who issued Plaintiff a Special Accommodation for "Brace, AFO, 24 Hours." The brace was given to Plaintiff the same day. (Docket no. 380 at 4-7.) When Plaintiff was transferred from RGC to JCF on April 27, 2011, a medical detail was generated at screening, which included the AFO brace. The medical detail was valid from April 27, 2011 until May 27, 2011. (Id. at 8-9.). On May 18, 2011, June 8, 2011, and June 11, 2011, and June 13, 2011, Plaintiff sent kites requesting an AFO brace replacement, but the replies indicated that he could ask about replacement during his next visit, for which no date was given. (*Id.* at 10-13.)

Plaintiff had an appointment with Defendant Miles on June 17, 2011, and requested a new AFO brace. Defendant Miles noted decreased muscle strength in Plaintiff's right foot. On July 1, 2011, Plaintiff sent a kite asking for a referral to physical therapy for a new AFO brace. The kite response indicated that a chart review was needed

and that a reminder was sent to the medical service provider. Plaintiff sent another kite requesting a new AFO brace on August 3, 2011. Plaintiff asserts that he continued to ask Defendant Miles for a new AFO brace at appointments on August 8, 2011, August 24, 2011, September 12, 2011, September 26, 2011, and October 21, 2011, but that Defendant Miles never documented his requests. Plaintiff again kited for an AFO brace on November 14, 2011, and the response indicated that a note was sent to the medical provider. In a November 22, 2011 Administrative Progress Note, Defendant Lybarger indicated that she discussed the issue with Defendant Miles, who said that he would follow up with Plaintiff. Plaintiff asserts that Defendant Miles again failed to note anything about Plaintiff's requests for a new AFO brace in his February 1, 2012 and March 13, 2012 treatment notes. An April 23, 2012 treatment note indicates that an AFO brace was ordered for Plaintiff. On July 27, 2012, Dr. Szymanski noted Plaintiff's history of right foot drop and his request to replace his AFO brace. Dr. Szymanski indicated that he would seek RMO approval of a new AFO brace. (Docket no. 371 at 23; docket no. 380 at 14-39.) Plaintiff received a new AFO brace on August 20, 2012. (Docket no. 305 ¶ 181.)

In Count Three of the Fourth Amended Complaint, Plaintiff claims that Defendants Miles and Ouellette knowingly, intentionally, and deliberately refused to order Plaintiff a new AFO brace to help with Plaintiff's foot drop and interfered with Plaintiff's use of his AFO brace. He claims that Defendants' refusal to allow Plaintiff to use his AFO brace left Plaintiff at a potential risk of serious harm, in violation of the Eighth Amendment. (Docket no. 305 ¶¶ 206-07.)

### 4. *Left Knee Brace*

Plaintiff was prescribed with a stabilizing knee brace on March 14, 2011. Plaintiff asserts that he was transferred from the Wayne County Jail to the MDOC on March 16, 2011, before he could obtain the brace; however, the RGC intake records indicates that Plaintiff arrived at RGC 11 with a knee brace. From April to August 2011, Boone requested replacements of his knee brace due to continued pain. According to Plaintiff, Defendant Miles took no action regarding Plaintiff's left knee brace at their first appointment on August 8, 2011 or at subsequent appointments in August and September 2011. (Docket no. 371 at 17; docket no. 378 at 1-15.)

Defendant Miles acknowledged Plaintiff's complaints of knee pain and his prescription for a knee brace at an October 21, 2011 appointment, and prescribed Celebrex for Plaintiff's pain. On November 2, 2011, Defendant Miles indicated that Plaintiff's knee brace was in need of repair and submitted a repair request. Dr. William Borgerding deferred the request because he could not find a special accommodation for the knee brace. Physician Assistant (PA) Aryan Taymour pointed out that Plaintiff did indeed have a special accommodation for a knee brace and sent another request on November 22, 2011. Defendant Lybarger also submitted a request for a knee brace for Plaintiff on December 5, 2011. On December 6, 2011, Dr. Borgerding again deferred the request, stating "[n]eed evidence of ligamentous instability on exam, not pain or crepitance[.]" (Docket no. 378 at 19-21, 23-30.)

On January 6, 2012, Defendant Lybarger noted left knee tenderness and mildly reduced range of motion upon examination. She instructed Plaintiff to continue his medication. Plaintiff continued to complain of knee pain in February, March, May, and June 2012. At a June 12, 2012 appointment with Defendant Ouellette, Plaintiff reported constant severe left knee pain, which included aching, burning, pinching, swelling; all aggravated by walking and standing. On examination, Defendant Ouellette noted that Plaintiff had a left-sided limp, that he ambulated with a cane, minimal swelling and mild crepitus in Plaintiff's left knee but that it was non-tender to palpation, and that Plaintiff was able to cross his left leg. Defendant Ouellette ordered an ice detail and instructed Plaintiff to continue his current medication and follow an exercise program. Defendant Ouellette ordered x-rays of Plaintiff's left knee on July 2, 2012. On July 25, 2012, Plaintiff complained of continued issues involving his knee. On July 27, 2012, Dr. Szymanski examined Plaintiff and noted crepitation and deceased left knee strength and mobility. Plaintiff complained of continued knee pain on August 26, 2012 and August 28, 2012. (Docket no. 378 at 30-52.)

Plaintiff's left knee hardware was removed on March 21, 2013. (Docket no. 378 at 58-59.) Plaintiff attests that he stopped using the knee brace after the surgery but that he eventually obtained another knee brace in June 2013. (Docket no. 371-2 ¶¶ 17-18.) The MDOC discontinued the knee brace in December 2013 due to a lack of objective findings of weakness and instability, but it was returned to Plaintiff pursuant to a December 19, 2013 court order. (Docket no. 81;

docket no. 378 at 60.) Plaintiff attests that he continued to use that stabilizing knee brace until he received another one from MDOC shortly before his release on March 14, 2018. (Docket no. 371-2 ¶ 20). After his release, Plaintiff received a total left knee replacement on June 7, 2018. (*Id.* ¶ 21.)

In Count Four of the Fourth Amended Complaint, Plaintiff claims that Defendants Miles, Lybarger, and Ouellette knowingly, intentionally, and deliberately denied Plaintiff use of his left knee brace, refusing to follow Plaintiff's discharge instructions from the hospital and refusing to listen to Plaintiff's complaints about his knee pain. Plaintiff claims that Defendants' denial of the knee brace left him at a potential risk of severe harm, in violation of the Eighth Amendment. (Docket no. 305 ¶¶ 210-11.)

### 5. Left Knee Hardware

Plaintiff fractured his left tibia on October 21, 2009, and subsequently underwent surgery at Botsford Hospital to repair the fracture, which included the placement of metal hardware around his knee. (Docket no. 377 at 9-10.). On March 14, 2011, a surgeon scheduled the removal of the hardware for some time within the next month, at Plaintiff's request. (*Id.* at 1-4.)

Before the surgery could be performed, Boone was transferred from the Wayne County Jail to the custody of the MDOC, on March 16, 2011. Plaintiff informed the MDOC of his knee pain and alleged need for surgery upon intake at RGC. Defendant Boomershine examined Plaintiff on March 17, 2011, and noted "[s]light bossing L medial knee fixation device." From March 2011 through August 2011, Plaintiff continued to inform MDOC staff (including Defendant Miles) of his knee pain and the alleged need for removal of the hardware. On August 8, 2011, Defendant Miles ordered an x-ray exam on Plaintiff's knee. The next time Plaintiff complained of knee pain to Defendant Miles was on October 21, 2011. Defendant Miles noted Plaintiff's pain complaints and Plaintiff's assertion that he was told that the hardware needed to be removed from his knee, and Defendant Miles prescribed Celebrex for Plaintiff's pain. On November 10, 2011, Defendant Miles requested an orthopedic evaluation for the removal of Plaintiff's left knee hardware. Defendant Lybarger resubmitted that request on December 5, 2011, due to no response. Defendant Squier denied the request on December 9, 2011, reasoning that there was no medical

necessity for the procedure at that time. She relied on the normal results from Plaintiff's December 5, 2011 physical examination and further reasoned that "[m]edications and surgery are far less effective for symptom relief than weight loss." (Docket no. 377 at 11-28, 31-48.)

On February 2, 2012, Defendant Miles met with Plaintiff, noted Plaintiff's disagreement with the findings regarding his left knee, and discussed Defendant Squier's denial of the orthopedic request and the alternative treatment plan set forth. From February to June 2012, Plaintiff continued to send kites and requests for medical care with regard to his knee pain and left knee hardware. At a June 12, 2012 appointment with Defendant Ouellette, Plaintiff reported constant severe left knee pain, which included aching, burning, pinching, swelling; all aggravated by walking and standing. On examination, Defendant Ouellette noted that Plaintiff had a left-sided limp, that he ambulated with a cane, minimal swelling and mild crepitus in Plaintiff's left knee but that it was non-tender to palpation, and that Plaintiff was able to cross his left leg. Defendant Ouellette ordered an ice detail and instructed Plaintiff to continue his current medication and follow an exercise program. Defendant Ouellette ordered x-rays of Plaintiff's left knee on July 2, 2012. The x-ray revealed calcification of the articulating cartilage at the knee suggestive of CPPD[5] and demineralization of the bony architecture representing osteoporosis/osteopenia. (1607). On July 31, 2012, Dr. Szymanski submitted a request for the removal of the Plaintiff's left knee hardware. Defendant Squier denied this request on August 2, 2012, again finding that medical necessity was not demonstrated. She reasoned that the most common reasons for hardware removal – infection and failure – were not present on the x-rays and that hardware removal was no guarantee of pain relief and generally not medically necessary. Her alternative plan was to perform further testing, which was performed and returned normal results. (Docket no. 346 at 91; docket no. 377 at 54-85.) Plaintiff initiated this lawsuit on September 9, 2012.

At a September 16, 2012 chronic care visit, Dr. Bhamini Sudhir indicated that he would start treating Plaintiff's knee for CPPD and evaluate his response to the treatment. On September 24, 2012, a clinical progress note was made to Plaintiff informing him that the

---

[5] Defendant explains that Calcium Pyrophosphate Deposition Disease (CPPD) is a type of arthritis similar to gout and often treated with NSAIDs and/or colchicine. (Docket no. 345 at 20 n.3 (citing www.verywellhealth.com).)

colchicine for his CPPD was being held because of the potential for a drug interaction with an antibiotic Plaintiff was on for a different complaint. On October 9, 2012, Dr. Sudhir requested and Defendant Squier authorized an orthopedic consultation. On the same day, Dr. Sudhir also authorized an extra pillow for Plaintiff's knees. On November 21, 2012, left knee X-rays were taken with an impression of 15 surgical intervention with old healed trauma, arthritic changes seen on the posterior surface of the patella as well as at the knee joint articulating surface, and no acute osseous changes. Plaintiff was also seen by orthopedic surgeon Dr. Khawaja Ikram who recommended physical therapy for strengthening followed by surgical removal of the hardware. (Docket no. 346 at 94-95, 102; docket no. 347 at 2-4, 17-18.)

On December 4, 2012, Dr. Rickey Coleman authorized one physical therapy visit at Duane Waters Hospital for evaluation and exercise program recommendations. Defendant Squier approved six additional outpatient physical therapy visits on December 19, 2012, at the request of the physical therapy department. Plaintiff refused to attend the next three physical therapy sessions. On February 7, 2013, Plaintiff attended a physical therapy session where it is noted that he tolerated the session well with improving range of motion but still complained of pain at the site of the hardware. On February 19, 2013, Plaintiff attended a physical therapy session which was limited due to pain at hardware site. On February 21, 2013, Plaintiff attended a physical therapy session where he inquired if it was his last day, stating "it doesn't matter I just want them to do the surgery anyway." Plaintiff refused to attend his last physical therapy session on February 26, 2013. (Docket no. 347 at 15-16, 22-23, 30-32, 36, 37, 39, 42.)

On March 5, 2013, Dr. Squier approved the surgical removal of the left knee hardware. (Docket no. 347 at 40-41.) Plaintiff's left knee hardware was removed March 21, 2013. (Docket no. 378 at 58-59.)

In Count Five of the Fourth Amended Complaint, Plaintiff claims that Defendants Corizon, Miles, Lybarger, Ouellette, Boomershine, and Squier knowingly, intentionally, and deliberately denied Plaintiff surgery to get the hardware from his knee removed for two years, failed to listen to his complaints about extreme pain and failed to follow the discharge instructions from the 16 hospital that he needed to get the hardware removed within a year. Plaintiff claims that Defendants' actions in this regard left him in "unnecessary and wanton infliction" of physical, mental, and emotional pain and suffering, in violation of the 8th Amendment. (Docket no. 305 ¶¶ 214-15.)

### 6. *Air Mattress*

In March 2008, Plaintiff underwent a total right hip replacement at the University of Michigan and was discharged back into MDOC custody with orders to sleep on an air mattress. (Docket no. 305 ¶¶ 19-20.) He subsequently received a special accommodation for an air mattress and continued to use it until he was paroled in 2008. (Id. ¶¶ 21-22.) Upon his return to the MDOC on March 17, 2011, Defendant Boomershine issued a special accommodation to Plaintiff for an air mattress. When Plaintiff was transferred to JCF, an air mattress was ordered for him on April 27, 2011 with a stop date of May 27, 2011. On May 23, 2011, Plaintiff submitted a kite requesting a new air mattress because his current one was leaking and was informed that he would be called out to exchange his old mattress for a new one. The exchange happened on May 25, 2011. Plaintiff exchanged his air mattress again on November 29, 2011. (Docket no. 346 at 2, 12, 14-15, 58.)

Plaintiff requested a new air mattress on March 5, 2012, and Licensed Practical Nurse Karina Beals told Plaintiff that it was being discontinued because according to Defendant Stieve and the standard criteria, Plaintiff did not meet the qualifications for an air mattress. On March 13, 2012, Defendant Miles informed Plaintiff that he did not meet the criteria for an air mattress. Plaintiff asserts that he began to experience severe back and hip pain after his air mattress was discontinued and sent multiple kites regarding the pain that he was experiencing. He was given an extra pillow for his hip on October 9, 2012. Plaintiff treated with Dr. Shanthi Gopal on November 1, 2012, at which appointment he was upset about his air mattress not being restored. Dr. Gopal advised Plaintiff to try the stretching exercises and weight loss recommended by the RMO; he also requested RMO approval for the non-formulary pain medication, Norco, for Plaintiff's chronic hip pain. This request was deferred in favor of trying rotating NSAIDs; Ultram 50 mg was approved. On December 11, 2012, Plaintiff reported to health care complaining of chronic pain, stating that the Ultram was being given too early to help and that his mattress was too hard. He was informed that he was not eligible for an air mattress. (Docket no. 347 at 8-9, 11-12, 19; docket no. 376 at 7-13, 18-22.)

On January 11, 2013, Dr. Gopal requested an off-guideline special accommodation for an air mattress due to Plaintiff's hip pain and desire not to use pain medication. Defendant Stieve deferred this request on January 14, 2013, stating it was not medically necessary. On February 6, 2013, at an appointment with Dr. Gopal, Plaintiff complained that right hip pain required him to sleep on his left side, which in turn led to pressure sores on his buttock. Plaintiff asserted that he did not want pain medication but wanted an air mattress. When Dr. Gopal informed him that the RMO denied his air mattress request, then he stated he wanted pain medication. Dr. Gopal noted a red area of abrasion on the left buttock which was dry with no active drainage or infection, and tender to the touch. Dr. Gopal prescribed antibiotic ointment. On March 7, 2013, Defendant Stieve approved an air mattress for Plaintiff for six months; Plaintiff received the air mattress on March 13, 2013. (Docket no. 347 at 27; docket no. 376 at 30-37.)

A proposed extension of Plaintiff's special accommodation for an air mattress was deferred on December 5, 2013 by Dr. Borgerding, who reasoned that "air mattresses are considered in cases of decubiti." The air mattress was removed from Plaintiff's property on December 9, 2013, but it subsequently returned to Plaintiff pursuant to the court's December 19, 2013 order and instructions from Defendant Stieve to MDOC staff in furtherance of that order. There is no indication that the named Defendants had any further involvement in Plaintiff's healthcare as it relates to his air mattress. Nevertheless, Plaintiff and the MDOC continued to disagree about Plaintiff's need for an air mattress. On February 6, 2015, the court granted Plaintiff's Motion for Preliminary Injunction and ordered Defendants to provide Plaintiff with an air mattress, which order was subsequently reversed by the Sixth Circuit on March 21, 2016, for an evidentiary hearing. On November 22, 2017, the court determined that an evidentiary hearing was no longer necessary and ordered Defendants to provide Plaintiff with an air mattress until his parole. (Docket no. 81; docket no. 285; docket no. 376 at 56-91.)

In Count Six of the Fourth Amended Complaint, Plaintiff claims that Defendants Stieve, Upston, Miles, and Ouellette knowingly, intentionally, and deliberately denied Plaintiff use of his air mattress, which left Plaintiff "in a lot of pain and has caused him sleepless nights." (Docket no. 305 ¶¶ 218-19.)

Lastly, in Count Seven of the Fourth Amended Complaint, Plaintiff claims that Defendants Stieve and Corizon violated his Eighth

Amendment rights by creating, implementing, or instituting various customs, policies, practices, and criteria. (Docket no. 305 ¶¶ 221-24.) Plaintiff seeks injunctive relief and compensatory and punitive damages.

### STANDARD OF REVIEW

The Court's review of objections to a Magistrate Judge's R&R on a dispositive motion is *de novo*. 28 U.S.C. § 636(b)(1)(c). "'[O]bjections disput[ing] the correctness of the magistrate's recommendation but fail[ing] to specify the findings . . . believed in error' are too general." *Novak v. Prison Health Services, Inc.*, No. 13-11065, 2014 WL 988942, at \*3 (E.D. Mich. Mar. 13, 2014) (quoting *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995)). Ordinarily, objections that lack specificity do not receive de novo review. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). In addition, the Court may accept, reject, or modify any or all of the Magistrate Judge's findings or recommendations. FED. R. CIV. P. 72(b)(3).

A party is entitled to summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Additionally, the Court views all of the facts in the light most favorable to the non-moving party and draws all reasonable inferences in the non-moving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Anderson*, 477 U.S. at 255.

## LEGAL STANDARD

Proving deliberate indifference under the Eighth Amendment requires a two-prong inquiry: objective and subjective. *Henry v. Michigan Dep't of Corr.*, 27 F. App'x 573, 575–76 (6th Cir. 2001). The objective component requires evidence of a sufficiently serious medical need. *Farmer* v. *Brennan*, 511 U.S. 825, 834 (1994); *Phillips v. Roane Cty., Tenn.*, 534 F.3d 531, 539 (6th Cir. 2008). For the medical need to be sufficiently serious, "a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.'" *Farmer*, 511 U.S. at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Additionally, a serious medical need can be shown "where a plaintiff's claims arise from an injury 'so obvious that even a layperson would easily recognize the necessity for a doctor's attention'." *Blackmore v. Kalamazoo County,* 390 F.3d 890, 899–900 (6th Cir. 2004) (citation omitted).

The subjective component requires evidence that a plaintiff's medical provider acted with a sufficiently culpable state of mind to inflict "unnecessary and wanton" pain. *Durham v. Nu'Man,* 97 F.3d 862, 869 (6th Cir. 1996); *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). This infliction need not be purposeful; reckless disregard of a known risk of serious harm will suffice. *Farmer,* 511 U.S. at 835; *Wright v. Taylor,* 79 Fed. Appx. 829, 831 (6th Cir. 2003). However, "mere

negligence, or even gross negligence, will not suffice." *Wright*, 79 Fed. Appx. at 831.

## ANALYSIS

**Objection 1:** "The Magistrate Judge erred in viewing facts in the light most favorable to Defendant and completely disregarded some facts provided by the Plaintiff." (ECF No. 390, PageID. 6353).

Plaintiff argues that the Magistrate Judge did not look at the facts in the light most favorable to Plaintiff for each allegation of deliberate indifference. The Court sustains this objection in regards to Plaintiff's need for a CPAP and Air Mattress and overrules the objection in regard to all other claims. The Court will address each medical condition in turn.

**A.** "The Magistrate Judge improperly viewed facts regarding the Continuous Positive Airway Pressure Machine (CPAP) in a light more favorable to Defendants Miles and Squier while disregarding other relevant facts." (*Id.*).

Plaintiff argues that the Magistrate Judge failed to consider several salient facts that create a genuine dispute such as Plaintiff's severe symptoms and use of a CPAP in the past. The Court finds that the Magistrate Judge did note several of these salient facts. *See supra* Part A. 1. However, the Court's *de novo* analysis leads it to conclude that there is a genuine issue of material fact regarding Defendants' deliberate indifference of Plaintiff's need for a CPAP.

First, a request for a CPAP due to sleep apnea is an objectively serious medical need. The record shows that Plaintiff experienced an inability to sleep due to shortness of breath. (ECF No. 371, PageID. 5647). Plaintiff even feared dying in his sleep. (ECF No. 375, PageID. 5835). The severity of Plaintiff's condition was evaluated on the Epworth Sleepiness Scale ("ESS"), which measures daytime sleepiness. A normal score range is 0-10. On September 26, 2011, Plaintiff scored a 10. (*Id.* at 5841-43). A year later, after no intervention, his score increased to 18. (*Id.* at 5859). A few months after that, his score increased again to 22. (*Id.* at 5907-08). Finally, two years after his first complaints, a CPAP order was approved on February 2, 2013. (*Id.* at 5912).

The record shows that in those two years, Miles and Squire were aware of Boone's increasingly worsening condition and failed to act. Miles also noted that the risk of sleep apnea included the following "certain heart conditions that can develop. There's respiratory conditions. Congestive heart failure is one being noted as being associated with sleep apnea. There's certain issues with encephalopathy or decreased cranial function that can be a result of extended sleep apnea." (ECF No.371, PageID. 5666). However, instead of ordering a study, Miles stated that there was no medical need for one. (ECF No. 375, PageID. 5846). Squire also denied Plaintiff's need for a sleep study and CPAP because Plaintiff did not suffer from hypertension. (*Id.* at 5850). However, he also noted that he would merely need to see evidence of harm

to evaluate if Plaintiff had sleep apnea (ECF No. 371-5, PageID. 5695), and simultaneously ignored extensive documentation of Plaintiff's harm. Accordingly, there is enough evidence for a reasonable jury to conclude that both Miles and Squire were subjectively aware of Plaintiff's serious condition and were indifferent to it for two years until it became too severe to ignore.

**B.** "The Magistrate Judge improperly viewed facts regarding Plaintiff's kidney stones in a light more favorable to Defendants Miles and Squier." (ECF No. 390, PageID. 6359).

The Magistrate Judge properly evaluated the facts regarding Plaintiff's kidney stones. Plaintiff claims that he received inadequate care upon returning to prison from the hospital. However, the record shows that his care was merely different than the care Plaintiff and/or his treating physician at the hospital preferred, not inadequate.

Our Circuit has held that "an allegation of questionable medical judgment states, at most, a claim for a medical malpractice, as opposed to a constitutional violation." *Owens v. O'Dea*, 149 F.3d 1184, 1998 WL 344063, at *4 (6th Cir. 1998); *see also Carter v. Michigan Dep't of Corr.*, No. 12-cv-12621, 2013 WL 5291567, at *4 (E.D. Mich. Sept. 19, 2013), aff'd (Sept. 26, 2014) ("Selecting the appropriate medication for a patient is a classic example of a matter for medical judgment, which may rise to medical malpractice but not deliberate indifference.") (citation and internal quotation marks omitted).

When, such as here, "an inmate has received on-going treatment for his condition and claims that this treatment was inadequate, the objective component of an Eighth Amendment claim requires a showing of care 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Rhinehart v. Scutt*, 894 F.3d 721, 736 (6th Cir. 2018); *see also Miller v. Calhoun Cty.*, 408 F.3d 803, 819 (6th Cir. 2005) (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)). "There must be medical proof that the provided treatment was not an adequate medical treatment of [the inmate's] condition or pain." *Rhinehart v. Scutt*, 894 F.3d 721, 737-38 (6th Cir. 2018).

Plaintiff has not presented such proof here. Plaintiff was discharged from the hospital with a prescription for Vicodin. (ECF No. 379, PageID. 6193, 6196). However, upon his return, Miles instead prescribed him with a different pain medication, Pyridium. (*Id.* at 6201). When Plaintiff's pain persisted and his kidney stones did not pass, he was not ignored. Miles ordered several urinalyses, a magnesium supplement, and a detail for further continued access to the bathroom. (*Id.* at 6220-21, 6232, 6233-35). Plaintiff claims that receiving a different medication and being treated after six days, rather than three to five as instructed by the hospital, are sufficient to create a genuine dispute of material fact. But under binding precedent and the facts alleged, the Court disagrees.

**C.** "The Magistrate Judge improperly viewed facts regarding the AFO Brace in a light more favorable to Defendant Miles." (ECF No. 390, PageID. 6361).

The Magistrate Judge properly ruled for summary judgment in Defendants' favor in regard's to Plaintiff's request for an AFO brace. Plaintiff claims that he needed a brace for his right foot drop to help with his mobility. The R&R notes that Plaintiff had difficulty walking and made several requests for a brace. Defendant Miles was aware of this medical need and prescribed him with a right shoe lift and cane to help him walk. (ECF No. 346, PageID. 4134). Plaintiff has failed to show how Miles's alternative treatment is grossly inadequate, as oppose to a proper exercise of his medical judgment.

Furthermore, Plaintiff fails to allege any facts regarding Dr. Ouelette's involvement in denying Plaintiff a foot brace. Therefore, summary judgment for Defendants on this claim is appropriate.

**D.** "The Magistrate Judge improperly viewed facts regarding the Knee Brace and Hardware in a light more favorable to Defendants Miles, Squier, and Corizon and disregarded other relevant facts." (ECF No. 390, PageID. 6363).

The Magistrate Judge properly viewed all of the relevant facts in a light favorable to Plaintiff and correctly concluded that Defendants properly treated Plaintiff, although differently than he preferred.

Plaintiff requested a left knee brace and removal of hardware due to pain and the fact that a physician at a clinic in Detroit had prescribed him with a brace and approved the removal of his hardware prior to his incarceration. Defendants

examined Plaintiff's knee and noted his pain. In response, Squire ordered and reviewed x-rays of Plaintiff's knee. (ECF No. 346, PageID. 4197-99). Upon her review she concluded that a removal of hardware was not medically necessary because there was no evidence of failure or infection, which are the most common reasons for hardware removal. She instead implemented an alternative treatment plan to perform CBC and ESR tests. (*Id.* at 4199). She additionally encouraged Plaintiff that weight loss would likely be an effective long-term remedy for his pain. (*Id.* at 4176). A few months later, when Squire noticed that Plaintiff's knee pain was not decreasing, she approved Plaintiff for an orthopedic consultation. (*Id.* at 4220-22).

As the Magistrate Judge noted, Miles was similarly active in responding to Plaintiff's pain by prescribing him Celebrex, ordering x-rays and requesting an orthopedic evaluation for the removal of Plaintiff's hardware. (*Id.* at 4199). Furthermore, it is important to note that during this time, Plaintiff already had a knee brace, however, it was different from the brace his orthopedic physician had prescribed. Miles even requested repair for Plaintiff's existing brace. Defendants failure to provide Plaintiff with the exact brace of his or his past physician's choice does not rise to the level of deliberate indifference.

**E.** "The Magistrate Judge improperly viewed facts regarding the Air Mattress in a light more favorable to Defendant Miles and disregarded other relevant Facts." (ECF No. 390, PageID. 6366).

Plaintiff argues that the Magistrate Judge did not look at the facts regarding his request for an Air Mattress in the light most favorable to him. The Court agrees. Looking favorably upon Plaintiff's evidence, the record shows that there are genuine disputes of facts on both the objective and subjective prongs of the deliberate indifferent claim.

First, had a serious medical need for an Air Mattress to treat his severe back and hip pain. He sent several kites chronicling severe unrelenting pain. (*See* ECF No. 374, PageID. 5727, 5730, 5738). Plaintiff even developed a bed sore sleeping on the hard mattress which was noted as a ""red area of abrasion on the left buttock above the gluteal fold . . . tender ot [sic] touch." (ECF No. 358-2, PageID. 4950). Significantly, Plaintiff also experienced severe emotional distress from his pain and lack of proper treatment. He expressed deep depression, hopelessness, and thoughts of suicide for over a year before he finally received relief. (*Id.* at 5811).

Second, Miles was aware of Plaintiff's continuous complaints regarding physical and emotional pain, but yet deprived Plaintiff of an Air Mattress because he did not find it to be medically necessary under the guidelines. However, Plaintiff presents evidence that his condition did fit under the guidelines. The guidelines stated that an Air Mattress may be ordered for an inmate if he or she had a history of  or "currently existing skin breakdown." (ECF No 354-4, PageID. 4018). Plaintiff's bed sores fit within this parameter. Moreover, Miles himself noted that

the conditions outlined in the guidelines were neither exhaustive nor limiting. (ECF No. 371-4, PageID. 5689). In other words, Miles knew that he could have given relief to Plaintiff that his life depended on, but instead chose to disregard Plaintiff's pain and did not order an Air Mattress until he was forced to by an order from this Court. This presents a genuine issue of material fact.

Although Plaintiff can sustain a claim against Miles for failing to provide him with an Air Mattress, he cannot do so against Ouelette. Plaintiff only claims that Ouelette did not treat Plaintiff's prior documentation of back and hip pain. (ECF No. 371, PageID. 5672). However, there is no evidence that Plaintiff asked Ouelette for an Air Mattress. Therefore, no reasonable juror could conclude that Oulette was subjectively aware of Plaintiff's medical need for an Air Mattress.

**Objection 2:** "The Magistrate Judge improperly Determined the credibility of the Defendants." (ECF No. 390, PageID. 6369).

Plaintiff argues that the Magistrate Judge made credibility determinations in favor of Defendants. The Court disagrees. The Magistrate Judge's findings can be summarized as follows: "[e]ach of Plaintiff's deliberate indifference claims contain the same general fact pattern – that Plaintiff did not receive the type of medical treatment that he requested, preferred, or believed was necessary, when he wanted it." (ECF No. 387, PageID. 6342). Accordingly, the Court finds that the Magistrate

Judge properly weighed both parties' evidence and found that even if all of Plaintiff's assertions were true, Defendants are entitled to summary judgement as a matter of law, because he merely did not receive his preferred treatment, rather than inadequate treatment. Regardless of whether the Court adopts the R&R's conclusions, the Court finds that the Magistrate Judge's analysis is within the bounds of the summary judgment standard of review. Objection 2 is overruled.

**Objection 3:** "The Magistrate Judge erred in deciding Plaintiff improperly plead new legal theories at the Summary Judgment Stage." (ECF No. 390, PageID. 6371).

The Magistrate Judge concluded that because Plaintiff's Fourth Amended Complaint did not include factual allegations of Defendant Stieve's personal involvement in the deprivation of Plaintiff's air mattress, Plaintiff's claims regarding Stieve's personal involvement were not properly plead and cannot be pursued. (ECF No. 387, PageID. 6325). The Court finds the contrary. Paragraph 218 of Plaintiff's Complaint states that "Defendant Stieve . . . did knowingly, intentionally, and deliberately deny Plaintiff use of his medically clear air mattress, in order to help relieve his hip pain." Because Plaintiff did properly plead Defendant Stieve's personal involvement in the deprivation of Plaintiff's air mattress, the Court may decide the merits of this claim.

In analyzing the claim's merits, the Court finds that Plaintiff has presented a genuine dispute of material fact. Plaintiff alleges that Steive told a nurse that Plaintiff did not meet the criteria for an air mattress, which required a condition such as a skin breakdown. (ECF No. 358-2, PageID. 4925; ECF No. 342, PageID. 3925). However, Plaintiff did have a skin breakdown in the form of a bed sore. (ECF No. 358-2, PageID. 4949-50).

Even if Plaintiff did not develop a bed sore, or Defendant Steive was not aware of it, he admits that the criteria for an air mattress is flexible and discretionary such that it could be supplied off the guidelines if it were in the patient's best interest. (ECF No. 358-5, PageID. 5031). However, despite repeated complaints of debilitating pain, Steive did not act in Plaintiff's best interest and order the air mattress until several months later. (ECF No. 374, PageID. 5752). Then after a six-month period the mattress was taken from Plaintiff and the evidence shows that Steive failed to have it returned until an order from the Court. (*Id.*; ECF No. 81). These facts could lead a reasonable jury to conclude that Steive was deliberately indifferent to Plaintiff's pain. Objection 3 is sustained.

**Objection 4:** "The Magistrate Judge Improperly Dismissed the CPAP Claim Against Defendant Stieve." (ECF No. 390, PageID. 6375).

Because Plaintiff has presented a genuine dispute of fact as to Defendant Stieve's personal involvement in denying him a CPAP, objection 4 is sustained. Plaintiff alleges that although he sent several kites regarding the pain and distress he experienced while sleeping, Stieve denied his request for a CPAP as medically unnecessary. (ECF No. 382-2, PageID. 4947-48).

**Objection 5:** "The Plaintiff was not allowed to submit a complete set of facts to the Court to show a genuine issue of material fact." (ECF No. 390, PageID. 6376).

Plaintiff claims that he was prevented from submitting a complete set of facts because the Magistrate Judge denied his Motion to File an Oversize Response to Defendants' Motion for Summary Judgment [356]. (ECF No. 362). As the Court already found in a prior order on the same matter, the Magistrate Judge did not clearly err in concluding that Plaintiff may not extend the page limit by forty-four pages. (*See* ECF No. 365, PageID. 5062). Objection 5 is overruled.

## CONCLUSION

For the reasons stated above, the R&R [387] is **ADOPTED in part**; Plaintiff's Objections [390] are **SUSTAINED in part** and **OVERRULED in part**; the MDOC Defendants' Motion for Summary Judgment [342] is **DENIED** with regard to Plaintiff's claims against Defendant Stieve and **DENIED as moot** with regard to Plaintiff's claims against Defendant Upston; and the Corizon Defendants' Motion for Summary Judgment [345] is **GRANTED in part** and **DENIED in part**.

This ruling has the effect of dismissing Counts 2, 3, 4, 5, and 7 of Plaintiff's Fourth Amended Complaint and dismissing Defendants Lybarger and Corizon. Counts 1 and 6 regarding the CPAP and Air Mattress remain.

Accordingly,

**IT IS ORDERED** that the R&R [387] **ADOPTED in part.**

**IT IS FURTHER ORDERED** that Plaintiff's Objections [390] are **SUSTAINED in part** and **OVERRULED in part**.

**IT IS FURTHER ORDERED** that the MDOC Defendants' Motion for Summary Judgment [342] is **DENIED** with regard to Plaintiff's claims against Defendant Stieve and **DENIED as moot** with regard to Plaintiff's claims against Defendant Upston.

**IT IS FURTHER ORDERED** that the Corizon Defendants' Motion for Summary Judgment [345] is **GRANTED in part** and **DENIED in part**.

**SO ORDERED**.


                                        s/Arthur J. Tarnow
                                        Arthur J. Tarnow
Dated: May 31, 2020`                    Senior United States District Judge